UNITED STATES of America

v.

John BALSAMO, a/k/a John Russo,
et al.

Crim. No. 78–19–SD.

United States District Court,
D. Maine, S. D.

March 29, 1979.

George J. Mitchell, U. S. Atty., Portland, Maine, James W. Brannigan, Jr., Asst. U. S. Atty. Marshall A. Stern, Bangor, Maine, for Michelle Balsamo (Russo).

Robert F. Collins, Dorcester, Mass., for Steven Freed, Raymond Cammisa and Michael Rossi.

Robert F. Muse, Boston, Mass., for Ricki Benedict, Kenneth Jenda, Samuel Weber and Michael Jenda.

Paul F. Markham, Boston, Mass., for Dennis Aprea, Clinton Velox, Gerald Prinzo and Vincent Dima.

John Wall, Richard A. Skerry, Jr., Boston, Mass., for John Ange and Carl Rosen.

William A. Brown, Boston, Mass., for Robert A. Rankin.

Joseph S. Oteri, Boston, Mass., for John Striano, Peter Neuer, Stephen Capoziello, Louis Calafato and Vincent Billi.

Martin G. Weinberg, Boston, Mass., for Thomas Jordan, Arthur Stingo, Thomas Gorra, Joseph Ferrandino and Eric Weber.

James W. Lawson, Boston, Mass., for Albert Schulz, Jeffrey Zwerling, Joseph Giordano, Anthony Bottiglieri and Robert Oswald.

Herman Kaufman, Jack T. Litman, Litman, Friedman, Kaufman & Asche, New York City, for John Balsamo (Russo).

## MEMORANDUM OF OPINION AND ORDER ON DEFENDANTS' MOTION TO SUPPRESS

GIGNOUX, Chief Judge.

Thirty-two defendants were initially charged in a two-count indictment with

conspiracy to possess with intent to distribute approximately 20 tons of marijuana in violation of 21 U.S.C. § 846 (Count I) and with possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) (Count II).[1] On motion of the government, the possession count (Count II) has been dismissed as against all but nine defendants.[2] Presently before the Court is defendants' substituted motion to suppress filed September 1, 1978, pursuant to Fed.R. Crim.P. 12(b)(3) and 41. An evidentiary hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the Court's findings of fact and conclusions of law as required by Fed. R.Crim.P. 12(e).

## I

## THE FACTS

A. *The Preliminary Investigation*

In November 1977 Trooper Robert Watkins of the Maine Department of Special Investigations (DSI)[3] learned from an informant that a man using the name John Russo, whose true name subsequently was determined to be John Balsamo, had leased a residence (the "Russo house") in a new subdivision in Boothbay, Maine, called Blue Hill Shores. A number of features of the rental aroused Watkins' suspicion. The informant stated that the lessee was living beyond his means and "acting strangely." The lessee was young and from out of state,

making frequent trips between Maine and Long Island, New York, where he owned a house. The lessee paid a high rent for a lease term that included off-season months.[4]

Watkins' subsequent investigation disclosed that the Russo house was located in a secluded wooded area on the Damariscotta River, with direct access by boat to the ocean. Adjacent to the residence was a common area and a deep water dock, both owned by Blue Hill Shores, Inc. and maintained for the subdivision's owners and tenants. Seven of the 30 subdivision lots had been sold, but only two residences had been completed: the Russo house, owned by Blue Hill Shores, Inc. and leased to Russo, and a house belonging to one Skillings (the "Skillings house"), separated from the Russo house by an undeveloped lot. Both were situated at the end of a dirt road connecting through the woods to the subdivision access road, which in turn joined a town road (the "Pension Ridge road").[5]

From November 1977 to April 1978 Watkins periodically traveled the access road to check on the Russo house. In November he observed that Russo was driving a 1977 blue Chevrolet pickup truck with a camper top, Maine Registration No. C–176–130. A check on the vehicle showed that it was registered to one Steve Hirshman at 21 Preble Street, Portland. Sergeant Daniel Ross of the Portland Police Department Automobile Theft Division informed Watkins that the registered address of the vehi-

---

1. All but one of the defendants were arrested on April 27, 1978, shortly after state and federal agents observed a large motor yacht dock and unload in the middle of the night at secluded waterfront property. Defendant John Balsamo, a/k/a John Russo, was not apprehended until December 1978. Another defendant, Thomas Schaefer, has died.

2. Count II has not been dismissed as to defendants John Balsamo, Freed, Cammisa, Michael Jenda, Rossi, Benedict, Kenneth Jenda, Samuel Weber, Jr. and Rankin.

3. The Department of Special Investigations (DSI) is a composite of state and local police officers specially assigned to control drug trafficking in Maine.

4. The normal tourist season in the Boothbay region extends from Memorial Day to Labor Day. Watkins determined that the rent being paid by Russo was $1,000 per month in the summer and $400 per month in the winter.

5. Although the lots were privately owned, the subdivision was open to the public. At the entrance to the access road, owned and maintained by the developer, a sign advertised lots for sale. There were no "No Trespassing" signs and the subdivision was not fenced off. The developer depended upon local police protection, and members of the public occasionally ventured down the access road to the common area and dock adjacent to the developed parcels.

cle was the Plaza Hotel. Ross further reported that a search of the hotel records revealed that no Steve Hirshman had ever lived there, and a hotel clerk had informed Ross that mail addressed to Hirshman had been returned as undeliverable.

Quite apart from Watkins' investigation, a totally independent vehicle investigation began in Portland in April 1978. On April 5 a clerk at the Portland City Hall alerted Detective Joseph Pelletier of the Portland Automobile Theft Division that two men using the names of Steve Hirshman and Stephen Thurston had registered three Chevrolet pickup trucks on April 4 and 5 under suspicious circumstances. The clerk reported that the man who identified himself as Hirshman on the first day gave his name as Thurston on the second. The address on each registration was the same: 21 Preble Street, Portland. Pelletier, believing that stolen vehicles were involved, went to 21 Preble Street, the Plaza Hotel, to investigate. Inquiry of the hotel personnel and a search of the hotel records for the past year disclosed that no Hirshman or Thurston had lived there.

Pelletier next called the Maine Department of Motor Vehicles in Augusta and was informed that a computer check revealed six vehicles, all late model Chevrolet pickup trucks, registered in the names of Steve Hirshman or Stephen Thurston. Two were registered to Stephen Thurston at 21 Preble Street, Portland (Registration Nos. C–190–468 and C–176–317) and a third to Steve Thurston, again at 21 Preble Street (Registration No. C–186–749). A fourth vehicle was also registered to Steve Thurston, but the address was listed as 699 Congress Street, Portland (Registration No. 625–222). Two other vehicles were registered using the 21 Preble Street address, one to Steven Hirshman and the other to Steve Hirshman (Registration Nos. C–176–130 and C–186–529). All six registrations gave April dates of birth. Two Thurston registrations gave birthdates exactly two years apart, April 12, 1942 and April 12, 1944. The two others gave the different birthdate, April 14, 1947. The Hirshman birthdays were also similar, April 12, 1942 and March 12, 1943. The registration to Steve Hirshman was signed "Steve Hirschman."

Clerks at the Department of Motor Vehicles informed Pelletier that certificates of title for one vehicle registered to Hirshman and two registered to Thurston at 21 Preble Street, Portland, had been mailed to the Plaza Hotel, but had been returned as undeliverable. Pelletier also attempted to verify whether anyone by the name of Steve Thurston had ever lived at the 699 Congress Street address given on one registration, but the owner and a resident of the boarding house at that address could not recall such a person. Pelletier's findings were reported to his supervisor, Lieutenant Dewey Martin, and to Sergeant Ross.

There was increased activity around the Russo house in early April 1978. At this time Watkins observed Russo driving the same blue Chevrolet pickup truck (Registration No. C–176–130) which had been seen at the residence in November. He learned that the vehicle was registered in the name of Steven Hirshman at 21 Preble Street, Portland. Upon inquiry, Sergeant Ross told Watkins that Hirshman had never resided there. Watkins also learned that Russo had demanded of the realtor overseeing the Blue Hill Shores property that the float and gangway, which had been destroyed by midwinter storms, be replaced immediately at the end of the fixed dock near his house.

In addition to the Russo house, law enforcement officers in April commenced surveillance of two other waterfront properties in the Boothbay region. Through a realtor, Watkins learned that an individual using the name Raymond Carrazzo [6] had rented a residence at Knickerbocker Lake (the "Carrazzo house"). On April 14 Watkins and Portland Police Detective Joseph Rich, temporarily on assignment to the DSI, observed two vehicles at the Carrazzo house. One was a red 1977 Dodge pickup truck with a camper cap registered to one Robert Staf-

---

6. At the hearing on the motion to suppress, defendant Cammisa testified that he had rented this property using the name Raymond Carrazzo.

ford at 21 Preble Street, Portland (Registration No. C–176–401). The other was a 1973 gold Plymouth Fury, which he learned was registered to one Steven Meyer at the same address (Registration No. 837–270). The same realtor whose suspicions had prompted the report of the Carrazzo house lease informed Watkins that a similar waterfront property had been rented in nearby Bayville by an individual named Anthony Scoriello, also from out of state (the "Scoriello house"). At the Scoriello house, Watkins and Rich observed a green 1978 Chevrolet pickup truck with a camper cap registered to Steve Thurston at 21 Preble Street, Portland (Registration No. C–186–749).

Detective Rich informed Portland Police Detective Michael Russo,[7] also temporarily on assignment to the DSI, of the foregoing findings. Russo communicated this information to his supervisor in the Portland Police Department, Sergeant Ross. Ross told Russo of the independent Pelletier investigation, and Russo obtained directly from Pelletier his list of the six suspect Hirshman/Thurston vehicles.

As a result of the above information, surveillance of the Russo house and the two related properties intensified in mid-April. Special Agent Michael Cunniff of the Drug Enforcement Administration (DEA) entered the investigation about April 20. He was fully informed of the findings which had been developed to that date. On April 20 a meeting of agents of the DEA, DSI, Lincoln County Sheriff's Department, and local police officers was held at the Scarborough Barracks of the Maine State Police. The information collected by the various agents, including the list of vehicles Pelletier had developed, was exchanged among the participants, and Cunniff stated that an analysis of the information indicated drug smuggling could be expected at the Blue Hill Shores development.

On April 20, Cunniff drove with Watkins to view the Russo, Carrazzo and Scoriello residences. On the following day, April 21, Cunniff observed the Russo property from a boat in the Damariscotta River. He noted the dock without the gangway and float in place. The next day, April 22, he again viewed the Russo property from the river and saw that the gangway and float had been installed. He also observed and photographed defendants John and Michelle Balsamo sitting with their daughter on the dock. Later that same day he saw and again photographed the Russo family as they approached the blue Chevrolet pickup truck (Registration No. C–176–130) in front of a hardware store in Boothbay Harbor. During the next few days Cunniff also made approximately six trips past the Carrazzo residence. He observed the green 1978 Chevrolet pickup truck (Registration No. C–186–749), the Plymouth Fury (Registration No. 837–270), and the red 1977 Dodge pickup truck (Registration No. C–176–401) parked there at various times.

The foregoing developments led the agents to believe that the arrival at Blue Hill Shores of a boat loaded with contraband was imminent, and constant surveillance of the Russo property was commenced from an observation post in a cottage approximately one mile away on the opposite side of the Damariscotta River. On April 24, representatives of the DEA, DSI, Maine State Police, Lincoln County Sheriff's Department, and the United States Coast Guard met at the Department of Marine Resources pier in Boothbay Harbor for the purpose of developing tactical plans for apprehending persons expected to be involved in the drug smuggling operation. It was anticipated that eight vehicles and upwards of 20 persons would be involved in the smuggling venture. An "assault" team of 6 to 12 uniformed officers in marked cars was planned for any eventual raid on the property. Other officers were to be sent to predetermined roadblock positions at key points on the roads leading to the subdivision. A list of suspect vehicles containing the six vehicles developed by Pelletier and the three vehicles seen at the Carrazzo and Scoriello residences, with brief descriptions and registration numbers, was distributed

---

7. Detective Michael Russo is no relation to defendant John Balsamo a/k/a John Russo.

among the roadblock personnel. Last, it was agreed that when smuggling activity was observed, the officers would assemble at the Railway Museum in Boothbay to receive final instructions.

## B. *The Assault*

Shortly after 11:00 p. m. on April 26, 1978, Trooper Robert Ruel of the DSI, one of the officers at the observation post across the Damariscotta River from the Russo property, saw a large white motor yacht, approximately 80 feet in length, approach and moor at the subdivision dock.[8] The yacht's navigational lights were not on. Persons were viewed on the topside of the vessel. The DSI agent in charge, Sergeant Paul Hooper of the Maine State Police, was notified, and by prearranged codes the various assigned officers were instructed to assemble at the Boothbay Railway Museum. The officers arrived at the museum at approximately 12:30 a. m. on April 27. From the museum two roadblocks were dispatched to their appointed positions at the approaches to the Blue Hill Shores development—one on Pension Ridge Road at its intersection with the Butler Road and the other on Back Narrows Road. A map of the area and the list of suspect vehicles, including the registration numbers and the named registrants of the trucks disclosed by Pelletier's investigation in Portland and the vehicles which had been observed at the Russo, Carrazzo and Scoriello residences were distributed. The assault team was organized, and Cunniff and Watkins were designated as a scouting team to approach the Russo property on foot.

1. *The Dock Area and the Onalay.* Shortly after 1:00 a. m. Cunniff and Watkins were driven to the intersection of the subdivision access road and the Pension Ridge Road. They entered a wooded area and walked through the woods and down the subdivision road to a point on the dirt road approximately 350 feet from the dock area. There they stopped.

From their position Cunniff and Watkins heard heavy nonrigid objects, sounding like "bales of hay," being dropped and loaded in the dock area. They heard what sounded like truck tailgates being opened and closed. Voices, coughing and sneezing were audible. The officers then observed two pickup trucks with camper caps, using only parking lights, come up the hill toward them from the dock area, turn, and back down the dirt road toward the Skillings house. The motors stopped, tailgates were put down, and unloading noises could be heard. Tailgates closed, engines started, and the trucks returned to the dock. This procedure was repeated, this time without parking lights operating. At this point Cunniff and Watkins radioed Sergeant Hooper to send in the assault team.

Four police cars, the first and third of which were marked patrol cars, made up the assault team. At approximately 2:00 a. m. they proceeded down the subdivision road to Cunniff and Watkins, who directed them toward the dock with flashlights. Cunniff and Watkins fell in running beside the cars. The third and fourth cars turned down the road to the Skillings house. The first two cars drove directly to the dock area. There the officers encountered a wall of marijuana bales, which partially blocked their passage to the dock. More bales were stacked in the dock area. They smelled a strong odor of marijuana. Three pickup trucks, all on the list of suspect vehicles, were parked in the area: the Russo truck (Registration No. C–176–130), the Scoriello truck (Registration No. C–186–749), and the Carrazzo truck (Registration No. C–176–401). The Russo and Scoriello trucks, parked at the dock, were almost filled with marijuana bales, which were plainly visible through the open tailgates. The Carrazzo truck was padlocked in the driveway. As the officers passed the trucks, a man fled from the turnaround area into the woods in the general direction of the Skillings residence.

---

8. Observation from the observation post was aided by the use of a "nightscope," an instrument that electronically illuminates the picture of the viewer so that it is almost as clear as one viewed through binoculars during daylight hours.

Defendants Freed, Cammisa, Michael Jenda and Rossi were arrested on the dock. Defendants Rankin, Benedict, Kenneth Jenda and Samuel Weber, Jr. were arrested on the boat. All eight were handcuffed, laid down on the dock, and advised of their *Miranda* rights, which they acknowledged they understood. A State Police officer obtained their identifications.

Following the arrest of the eight defendants, State Police Captain Melvin Graves of the DSI, boarded the boat, identified as the yacht "Onalay," to see if any more persons were aboard. No one was discovered, but Graves found large amounts of marijuana, both bales and debris. Graves did not search the boat. State Troopers Metivier and Lyons also boarded the boat. They, too, noted bales of marijuana. After checking to find no one aboard the vessel, Metivier remained in the pilothouse to maintain security. A number of other officers also boarded the boat in the early morning hours.

Cunniff seized the boat, the three pickup trucks parked in the dock area and 487 bales of marijuana found on the boat, in the two open trucks, and in the dock area.[9] DEA Agent Wayne Steadman and other officers searched the two open trucks—the Russo truck (Registration No. C–176–130) and the Scoriello truck (Registration No. C–186–749)—and removed the marijuana bales found therein. The Carrazzo truck (Registration No. C–176–401), which was closed, was not searched until the following day, after a search warrant had been obtained. Also during the day of April 27 Steadman and Watkins took samples of various bales found in the dock area, in the two open trucks and on the vessel. The samples were sent to the DEA office in New York, where all tested positive for marijuana. The bales were transported to Augusta.

At approximately 6:30 a. m., State Police Sergeant Paul Lessard and other personnel from the State Police crime laboratory, at Cunniff's direction, boarded the Onalay and seized a number of items, including guns, ammunition, electronic equipment, marijuana, notebooks, attache cases, and a variety of other items.[10] The Onalay was taken to the Marine Resources pier in Boothbay on the afternoon of April 27. There Steadman and other officers removed 231 bales of marijuana from the vessel. Several days later the vessel's contents were inventoried.

2. *The Skillings House.* Meanwhile, Trooper Ruel and three other officers, who had driven in the last two vehicles, had secured the Skillings residence. Without entering the house, they searched its perimeter and observed burlap covered bales through the glass doors at the lower level of the dwelling. Graves and Cunniff arrived by foot at the Skillings cottage about 15 minutes later in search of the person who had fled in that direction. Ruel pointed out to Cunniff the bales visible in the lower level of the house through the glass doors. Cunniff and Ruel saw curtains moving inside the house. Suspecting that someone might be inside, Cunniff and Graves entered the house. They quickly ascertained that no one was inside and, after determining that an automatic heating duct had caused the curtains to move, they left. Cunniff gave directions not to search the house until a warrant was obtained. In fact, the house was not searched and the marijuana was not seized until the next day when a warrant was obtained.

3. *The Russo House.* Prior to going to the Skillings house, Graves had gone to the Russo residence in search of the fleeing suspect. He was met by the officer who had been assigned to secure the residence. Hearing someone inside, Graves entered the house armed with a pistol and found defendant Michelle Balsamo with her child in the hallway. He placed her under arrest. Before proceeding to the Skillings cottage,

9. Counsel have stipulated to a list of the contraband, instrumentalities and evidence seized, the places from which the seizures were made, and the times of the seizures, all between April 27 and May 2, 1978.

10. One of the briefcases taken was opened by the officers. It had been closed, though unlocked. The papers contained in the case belonged to defendants Benedict and Rankin.

he explicitly directed the remaining officer not to conduct a search of the house.

After checking the Skillings house, Graves returned to the dock. One man had developed cramps and Graves took him to the Russo house.[11] While there, Graves attempted to speak with Michelle Balsamo. She indicated that she wanted to see her husband, that the boat had arrived early, and that she was not supposed to be there. Graves told her that no harm would come to her or her child. He did not advise her of her *Miranda* rights.

Near daybreak, Trooper Ruel, at Graves' direction, again interviewed Michelle. She identified herself as "Michelle Russo" and kept insisting that she was not supposed to be there and that she did not know of her husband's business. She said that she was from New York, but would not give an address or birthdate. Ruel did not place Michelle under formal arrest, nor did he issue *Miranda* warnings.

At approximately 7:30 a. m., Steadman approached the Russo residence. Ruel told Steadman of his lack of success in interviewing Michelle. Steadman then again attempted to interview her, but obtained no more information than what Ruel had garnered. Unaware that Graves had earlier arrested her, Steadman arrested Michelle, read her the *Miranda* warnings, and determined that she understood each one.

Except for the preliminary check for people, the Russo house was not searched until the following day, after a search warrant had issued.

4. *The Carrazzo and Scoriello Houses.* At approximately the same time the searches at the Russo property were underway, teams of officers, lead by Steadman and Watkins, secured the Carrazzo and Scoriello houses. Neither house was searched until search warrants were obtained the next day. At the Carrazzo house, a pickup truck on Pelletier's list (Registration No. C–190–468), registered to Stephen Thurston, was found. At the Scoriello

house, the officers found the Plymouth Fury (Registration No. 837–270) registered to Steven Meyer, 21 Preble Street, Portland, and a pickup truck (Registration No. C–176–598) registered to Anthony Scoriello at 21 Preble Street. The three vehicles were seized, but were not searched until the following day when search warrants were obtained.

### C. *The Pension Ridge Road Roadblock*

Pursuant to the prearranged plan, a roadblock was established at approximately 2:00 a. m. on April 27, 1978 on the Pension Ridge Road just south of the Butler Road intersection. It was manned by Sergeant Fred Davis, Jr. and two other officers from the Lincoln County Sheriff's Department. The officers' marked car was placed across Pension Ridge Road with its blue lights flashing. The officers had been given the list of suspect vehicles prior to leaving the Boothbay Railway Museum.

At approximately 2:40 a. m. a pickup truck approached the roadblock heading south on Pension Ridge Road toward the Blue Hill Shores subdivision. The truck passed the Butler Road intersection and stopped approximately 50 feet from the roadblock, at which point it either backed up or rolled backward down the incline at the point of stop. On command of the officers, it stopped. The truck was a late model green 1975 Chevrolet pickup truck with camper cap. Sergeant Davis, armed with a handgun, and Deputy Donald Forbes, with a shotgun, approached the truck, observing as they did so that the license plate number (C–625–222) was on the suspect vehicle list. Davis asked the driver for a license and registration, which were produced. The driver was defendant Stephen Capoziello. The truck was registered in the name of Steve Thurston at 699 Congress Street, Portland. Davis ordered the driver and the two passengers in the cab, subsequently identified as defendants

---

11. At some point during the early morning hours the remaining seven defendants arrested on the dock were brought into the Russo house

from the cold to await transportation to the jail.

John Striano and Peter Neuer, to step from the cab, and Forbes held them at the front of the truck with his shotgun while Davis returned to his vehicle and radioed Cunniff. Chief Leighton Davis and Officer Manley Stover of the Boothbay Harbor Police Department, who had arrived at the roadblock a short time before, remained in their vehicle parked a short distance away.

When informed of the stop, Cunniff directed Sergeant Davis to hold the three defendants until he arrived. While awaiting Cunniff's arrival, Capoziello kept asking why they had been stopped. Sergeant Davis told him that someone would soon arrive who could answer his questions.

Cunniff, with State Trooper Conrad McNaughten, arrived at the scene within 10 to 15 minutes of Sergeant Davis' call. He identified himself as a federal narcotics officer. He observed that the windows of the camper cap were covered with material and that the cap door was locked to the tailgate with two padlocks joining double hasps and staple devices similar to those on the trucks found at the dock area. Cunniff questioned Capoziello as to who owned the truck and where he and his companions were going. Capoziello responded that the truck belonged to a friend, whom he eventually identified as Steve Thurston. He stated that the three were going fishing. When Cunniff inquired as to the whereabouts of their fishing gear, Capoziello replied that they planned to buy it. Cunniff informed him that it was 3:00 a. m. Capoziello merely smiled. Cunniff then placed the three men under arrest for conspiracy to violate the federal narcotics laws, seized the truck, and asked Capoziello for permission to look into the back of the truck. When Capoziello hesitated, Cunniff stated that he would obtain a search warrant, and instructed Sergeant Davis to take the arrested men to the Lincoln County jail in Wiscasset for booking. He also told Chief Davis that the truck had been seized and instructed him to call a wrecker to tow the truck to the Lincoln County Sheriff's office. He gave the truck's keys to Chief Davis and directed him not to search the truck until a warrant could be obtained. At this point Cunniff received a radio call that another truck on the suspect list had been stopped on Route 1. He and McNaughten left the scene. Sergeant Davis also departed for Wiscasset with the three defendants.

After Cunniff's departure, Chief Davis instructed Stover to turn the truck around to get it in position to hook up to a wrecker. As he did so, Stover noticed that the truck handled as if it were heavily loaded. Attempting to determine what the heavy load was, he walked to the back of the truck, unlocked one of the padlocked hasps, pulled the tailgate door slightly ajar and peeked in. There he saw several pairs of eyes. He replaced the lock and told Chief Davis what he had seen. Davis radioed for assistance and notified Cunniff, who was then at Route 1. Cunniff told Davis to arrest the men in the back of the truck for conspiracy to violate the federal narcotics laws.

State Trooper Robert Sanborn was the first to respond to Davis' call for assistance. After asking the people inside of the rear of the truck whether they were armed, Sanborn opened the door and instructed them to exit one at a time. Thirteen men filed out of the truck: defendants Calafato, Billi, Jordan, Gorra, Eric Weber, Stingo, Ferrandino, Schulz, Giordano, Oswald, Zwerling, Bottiglieri and Schaefer (now deceased). Sanborn placed them all under arrest, advised each of his *Miranda* rights and obtained from each an acknowledgement that he understood them. After a brief period, the 13 were placed back inside the pickup. Cunniff returned sometime later. He called through the door, asking where the 13 men were from. The collective answer was "Brooklyn." At Cunniff's direction, Stover then drove the truck and passengers to the Lincoln County Sheriff's office. Chief Davis followed behind in his car. On the way, the passengers tore up slips of paper and threw them out the truck window until Davis told them to stop.[12]

---

12. Three small quantities of marijuana were taken from the truck at the Lincoln County Sheriff's office in the early morning hours of April 27. Luggage was also found in the rear

## D. *The Route 1 Stop*

At approximately 2:00 a. m. on April 27, 1978, Officer Ira Cohen of the Bath Police Department, on routine patrol, observed two late model pickup trucks with camper caps, apparently driving in tandem, traveling at a high speed northbound on Route 1 in Bath. He radioed his supervisor, Sergeant David Haggett of the Bath Police. He was suspicious that the trucks might be involved in drug trafficking.[13] Cohen followed the trucks for approximately one-half mile on Route 1 within the Bath city limits. He clocked them at speeds varying between 53 and 61 miles per hour in a 35-mile per hour zone. He stopped the second truck, a Chevrolet pickup truck bearing Maine license plate No. C–176–317, just over the Carlton Bridge in Woolwich.[14] Sergeant Haggett arrived in his patrol car shortly thereafter.

The occupants in the cab of the truck were defendants Prinzo, Velox and Aprea. Cohen told Prinzo, the driver, that he was being stopped for speeding and requested a license and registration. Prinzo produced a Florida driving license and a Maine registration, No. C–176–317, in the name of Stephen Thurston, 21 Preble Street, Portland.[15] Asked if he was following the other vehicle, Prinzo replied, "What vehicle?". When asked where they were headed, Prinzo said that they were on their way to Canada to go camping. At Haggett's request, Prinzo opened the back of the truck. Defendant Dima, with some boxes and other items, was inside. Upon questioning, Dima stated that he was a hitchhiker from New York going to Canada. When asked who owned the truck, Prinzo said that it belonged to a friend. The driver and passengers stated that they were lost and asked directions to a gas station, a motel, a rest area, and how to return to the interstate highway. Cohen told them to reverse direction and go back to Brunswick. Asked where in Canada he was going, Prinzo replied, "Brunswick."

After issuing a speeding ticket, the Bath officers let the truck go on its way. The truck turned around and headed south in the direction of Brunswick. Sergeant Haggett followed the vehicle. After going through Bath, the truck turned around and again started north. Still following the truck, Haggett radioed ahead to the Lincoln County Sheriff's office and advised them that a suspicious truck was headed their way. His radio call was intercepted by Colonel Allen Weeks, Chief of the Maine State Police, who instructed Haggett to keep pursuing the truck until it reached the Route 27 turnoff to the Boothbay area, as it might relate to a current investigation in Boothbay. Weeks reported this development to Cunniff, who was then at the Pension Ridge roadblock. Noting that the truck's registration was on the suspect vehicle list, Cunniff requested Weeks to have the truck stopped and the occupants held for him to question. Weeks so instructed Haggett, who with the assistance of officers from the Lincoln County Sheriff's office effected the stop on Route 1 in Newcastle.[16]

Haggett told the truck's occupants that they were stopped until proper authorities came. Special Agent Wayne Steadman of the DEA arrived five or six minutes after

of the truck and subsequently searched. An inventory of the contents of the truck was made at the Scarborough Police Barracks on May 2.

13. Cohen was not involved in the Boothbay investigation, nor did he have a list of suspect vehicles. He had, however, received instructions to be on the lookout for drug trafficking and had been furnished a "profile" of what to look for.

14. Cohen testified that it would have been unsafe to make the stop on the Carlton Bridge, which is narrow.

15. This was a vehicle on the suspect list, although, as mentioned, Cohen did not have a copy of the list.

16. The stop was made at a point north of the intersection of Route 1 and Route 27, the most direct route to Boothbay, but south of the River Road, another, longer, route from Route 1 to the Boothbay area.

the stop, at about 3:00 a. m.[17] Steadman identified himself as a federal narcotics agent investigating drug smuggling and asked Prinzo if he could look into the back of the truck. Prinzo replied that it was open and Steadman was welcome to look. In the back, Steadman saw two large industrial vacuum cleaners and a large quantity of unrefrigerated beer, soda, and hamburgers, but no camping gear. He advised the occupants of their *Miranda* rights, making sure that each acknowledged and understood them. He asked Prinzo where they were heading. Prinzo responded to Canada for camping. The next question was who owned the truck. The reply was, "A friend named Stephen Thurston." Steadman asked where they were going in Canada. Prinzo answered, "No place special." While examining Prinzo's Florida driving license, Steadman noticed another driver's license on the ground at Prinzo's feet. It was also a Florida license, bore Prinzo's photograph and the same address as on the license Prinzo had first produced, but it was issued in the name of "Gerard Matino." Prinzo then asked to be released or arrested. Steadman placed Prinzo under arrest and told other officers to arrest the three other occupants of the truck: Aprea (who identified himself as Dennis Russo), Dima and Velox. Each was again informed of his *Miranda* rights and pat searched. At about this time Cunniff arrived. He identified himself as a DEA agent and, unaware that they had been arrested, questioned the men, determining only that Aprea (who again identified himself as Dennis Russo) was from Brooklyn. Cunniff was then called back to the Pension Ridge stop.

The four men were handcuffed and taken to the Lincoln County Sheriff's office. The truck was seized and taken to the same location. The only item removed from the truck on April 27 was a suitcase containing miscellaneous papers.

*E. The Portland Holiday Inn Arrests*

In the early afternoon of April 27, while defendant Capoziello was being processed at the United States Courthouse in Portland, DEA Agent Edward Drinan and Detective Rich found on him a note reading:

John
Holiday Inn
Maine Tpke Exit 8
207 774–5601
Room 147

At Drinan's request, Lieutenant Martin, Sergeant Ross and Officer Conley of the Portland Police Department went to the Holiday Inn, arriving at about 3:00 p. m. There they learned that the occupants of Rooms 147 and 149 had been transferred to Rooms 166 and 168. Standing in the hall outside Room 166, the officers smelled marijuana smoke. They knocked on the door to Room 166 and defendant John Ange partially opened it. After identifying themselves, the officers asked to enter the room. Ange opened the door fully and permitted them to enter. Defendant Carl Rosen, lying on the bed, was told to stay where he was. Ross patted down Ange, finding a gravity knife, a set of keys, several of which appeared to be automobile keys, and a small bag of marijuana. He asked if either man owned a vehicle. They answered in the negative. Rosen was then patted down. Martin telephoned Drinan, who instructed the officers to arrest the two men and bring them to the courthouse for questioning. Acting on Drinan's instructions, Martin arrested the two men, read them their *Miranda* rights, and took them, handcuffed, to the police car parked in the hotel lot.

On the way out of the room Ross noted two pickup trucks parked in the lot near Rooms 166 and 168. One was a green 1978 Chevrolet pickup truck with a camper cap, Maine Registration No. C–186–529.[18] The other had Connecticut license plates. Ross called a police dispatcher, who informed

---

17. Steadman had been driving with State Police Sergeant Harry Bailey from Portland toward Boothbay to assist in the investigation.

18. This vehicle was on the suspect list, although the officers did not have a copy of the list.

him that the Maine registered vehicle was registered to Steve Hirshman at 21 Preble Street, Portland. Ross then said to Conley, "I think someone lied to me." From the back seat of the police car Ange volunteered: "I didn't lie. You didn't ask the right question. We borrowed the truck."

At the United States Courthouse Drinan questioned Ange and Rosen. They denied knowing Capoziello. When Drinan asked Ange about the keys, Ange claimed to have found them in the Holiday Inn parking lot. Drinan then again placed both men under arrest and advised them of their *Miranda* rights.

Later that afternoon, Ross returned to the Holiday Inn and found that the keys taken from Ange fitted the Maine registered pickup truck. Ross then drove the truck to the Federal Courthouse, where he delivered it to Drinan. The truck contained a bladder of fuel filled with 500 gallons of diesel oil.

## F. *The Warrant Searches*

Between 9:00 and 9:30 p. m. on April 28 Cunniff and Watkins obtained search warrants from the federal magistrate in Portland for: the Russo residence; the Skillings residence; the Carrazzo residence; the Scoriello residence; the red Dodge pickup truck (Registration No. C–176–401), which had been found padlocked in the driveway of the Russo house; the gold Plymouth Fury (Registration No. 837–270), which had been found at the Scoriello residence; the green Chevrolet pickup truck (Registration No. C–176–598), which had been found at the Scoriello residence; and the black Chevrolet pickup truck (Registration No. C–190–468), which had been found at the Carrazzo residence. The warrants were executed the same evening. The search warrants for the four residences were executed by Steadman between 9:15 and 9:55 p. m. The residence searches continued until shortly before midnight. The searches of the four vehicles were executed by Cunniff between 10:50 and 11:45 p. m. No defendant was present when any of the warrants were executed.

## II

### THE LAW

Defendants seek to suppress all the evidence obtained directly or indirectly from the foregoing searches and seizures. With respect to the warrantless searches and seizures, suppression is sought on the ground that they were not justified by exigent circumstances or any other recognized exception to the Fourth Amendment warrant requirement. With regard to the searches and seizures pursuant to search warrants, suppression is sought on the grounds that the supporting affidavits failed to set forth sufficient probable cause for their issuance, that the warrants did not sufficiently particularize the items subject to seizure, and that the warrants were improperly executed. In addition, defendants contend that the statements and admissions made by various defendants are inadmissible under the doctrine of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At the outset, the Court reiterates the fundamental tenets of the law of search and seizure. First, warrantless searches and seizures are impermissible unless justified by either exigent circumstances or other recognized exceptions to the warrant requirement. *E. g., Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). The burden rests on the Government to prove that such circumstances existed or such exceptions were applicable when it attempts to validate a warrantless search or seizure. *Id.* Second, when a search is based on a warrant, the supporting affidavits presented to the magistrate "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 114–15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

Unlike warrantless searches and seizures, there is a presumption that those conducted on the authority of a warrant are valid. *United States v. Ventresca, supra* 380 U.S. at 106, 85 S.Ct. 741.

 The Court will also briefly set forth the basic principles of the law of standing as it relates to defendants' Fourth Amendment claims. As a general rule, Fourth Amendment rights may not be vicariously asserted. *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). To contest a search or seizure on Fourth Amendment grounds, a defendant must have either "actual standing" or "automatic standing." The burden to establish standing is on the defendant. *Rakas v. Illinois*, —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). To have actual standing under the test recently announced by the Supreme Court in *Rakas*, a defendant must establish a legitimate and reasonable expectation of privacy in the premises searched or the property seized. A defendant who does not have actual standing may still have automatic standing under the doctrine originally formulated by the Supreme Court in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), if charged with a crime that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.[19]

### A. The Searches and Seizures at Blue Hill Shores on April 27

Defendants seek to suppress all evidence seized by the officers at the Blue Hill Shores development during the early morning hours of April 27. Suppression of any evidence seized from the dock area, from the two open pickup trucks found there and from the Onalay is sought on the ground that such evidence was the product of warrantless searches and seizures that were not justified by exigent circumstances or any other recognized exception to the Fourth Amendment warrant requirement. In addition, defendants contend that their Fourth Amendment rights were violated by the searches of the Russo and Skillings residences, even though no evidence was seized therefrom on April 27. The Court finds no merit in defendants' contentions.

### 1. The Dock Area

 Only defendant John Balsamo and the eight defendants arrested at the dock area, Freed, Benedict, Cammisa, Kenneth Jenda, Michael Jenda, Weber, Rossi and Rankin, have standing to raise Fourth Amendment objections to the searches and seizures at the dock area. These nine defendants having been charged in Count II of the indictment with possession of marijuana in violation of 21 U.S.C. § 841(a)(1), are charged with a crime that includes as an essential element possession of the evidence seized at the time of the contested searches and seizures, and hence have automatic standing to object under the doctrine of *Jones v. United States, supra.*[20]

None of the remaining defendants, however, has established a reasonable expecta-

---

**19.** The Supreme Court has questioned, but has not decided, whether the concept of automatic standing as expounded in *Jones v. United States, supra*, remains viable in light of *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *See Rakas v. Illinois, supra* at 4027, n.4, 99 S.Ct. 421; *Brown v. United States*, 411 U.S. 223, 228, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). In post-*Brown* decisions, there is a split of authority as to whether the doctrine survives. *Compare United States v. Riquelmy*, 572 F.2d 947, 950–51 (2d Cir. 1978) *and United States v. Boston*, 510 F.2d 35, 37–38 (9th Cir. 1974), *cert. denied*, 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975) *with United States v. Delguyd*, 542 F.2d 346, 350 (6th Cir. 1976). This Court will assume that the automatic standing rule of *Jones* has not been implicitly overruled by *Simmons* until the Supreme Court rules on that issue.

**20.** Arguably, John Balsamo, as lessee of the adjacent residence, may have had a sufficient proprietary or possessory interest in the premises to establish a reasonable expectation of privacy in the common areas searched, and thus have actual standing. *See Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565. The eight defendants arrested at the dock area do not appear to have had a "legitimate" expectation of privacy sufficient to establish actual standing. *See Rakas v. Illinois, supra* at 4030 n.12, 99 S.Ct. 421.

tion of privacy in the premises searched or the property seized. *Rakas v. Illinois, supra.* They were not present on the premises, nor has any of them ever claimed a proprietary or possessory interest in the premises or the items taken. They, therefore, do not have actual standing to object. *Id.; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565. Similarly, the concept of automatic standing does not help these defendants. Count II of the indictment having been dismissed as to them, the remaining count (Count I) only charges these defendants with conspiracy to distribute marijuana in violation of 21 U.S.C. § 846. The Government need not prove that these defendants possessed marijuana in order to convict them of conspiracy under 21 U.S.C. § 846. *United States v. Riquelmy,* 572 F.2d 947, 951 (2d Cir. 1978); *United States v. Prueitt,* 540 F.2d 995, 1004 (9th Cir. 1976), *cert. denied sub nom. Temple v. United States,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977); *see Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565; *United States v. Galante,* 547 F.2d 733, 736–38 (2d Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Boston,* 510 F.2d 35, 37–38 (9th Cir. 1974), *cert. denied,* 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975). These other defendants, therefore, lack automatic standing to challenge any of the searches and seizures contested in this case.

■ a. *The Entry into the Subdivision.* Even as to the nine defendants having standing to contest the searches and seizures at the dock area, the initial entry by Cunniff and Watkins into the subdivision woods did not violate their Fourth Amendment rights. In the first place, defendants' arguments proceed from the premise that this conduct of the officers was conduct subject to Fourth Amendment requirements. The officers' entry, however, violated no "legitimate" or reasonable expectation of privacy of the defendants, and thus no Fourth Amendment interests were involved. *See Rakas v. Illinois, supra* at 4030 n.12, 99 S.Ct. 421; *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Coplen,* 541

F.2d 211, 214–15 (9th Cir. 1976), *cert. denied,* 429 U.S. 1073, 50 L.Ed.2d 791 (1977); *United States v. Pruitt,* 464 F.2d 494, 495–96 (9th Cir. 1972). A large sign advertising lots for sale stood at the entrance to the subdivision, inviting entry by the public to inspect the property. There were no "No Trespassing" signs or fences restricting access to the property. The owner-developer relied on local police to patrol the subdivision. The use of the common roads was not monitored in any way. Any subjective belief defendants may have had that their activities would go undetected was neither legitimate nor reasonable. *See Rakas v. Illinois, supra* at 4030 n.12, 99 S.Ct. 421; *Katz v. United States, supra* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring); *United States v. Freie,* 545 F.2d 1217, 1223 (9th Cir. 1976), *cert. denied sub nom. Gangadean v. United States,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977). Thus, the agents' entry simply did not amount to regulated conduct. *See Katz v. United States, supra* 389 U.S. at 351, 88 S.Ct. 507; *United States v. Freie, supra* at 1223; *United States v. Pruitt, supra* at 495–96.

■ In the second place, even assuming arguendo that the officers' conduct was subject to the Fourth Amendment, ample cause existed for the warrantless entry. Investigation prior to April 27 had disclosed a number of events regarding the Russo property which were consistent with a common *modus operandi* of drug smuggling ventures in this coastal region of Maine. *See United States v. Patterson,* 492 F.2d 995, 997 (9th Cir.), *cert. denied,* 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974). A nonresident with no apparent connection to the area had leased secluded property with direct access to the ocean by boat for a term which included off-season months. An informant's tip connected the property with two other neighboring coastal residences. Surveillance of these properties detected at least three vehicles, of a type known to be used to transport contraband, which were among a group registered under suspicious circumstances. *See United States v. Clark,* 559 F.2d 420, 424–25 (5th

Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). With the boating season still weeks away, the lessee had demanded that a float and gangway be attached to the deep water dock in the subdivision. On the night of the entry into the property, the agents observed an oceangoing vessel approach the deep water dock without using its navigational lights. Activity by an unknown number of individuals with at least two trucks was observed at the dock. *See United States v. Coplen, supra* at 215; *United States v. Young*, 535 F.2d 484, 487–88 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). It was not the normal boating season, and the boat docked near the midnight hour. The totality of these facts and circumstances, known to experienced agents familiar with the methods employed by smugglers, established more than adequate probable cause to believe that illicit smuggling of contraband was in progress and to justify the initial entry into the subdivision by Cunniff and Watkins. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *United States v. Patterson, supra* at 997.

The Court also rejects defendants' contention that probable cause had existed for a sufficient time to enable the agents to obtain a magistrate's approval before entering. Contrary to defendants' assertion, it was not until the Onalay docked that the agents knew a crime was being committed. While the facts known to them prior to the arrival of the boat were certainly suspicious, the officers could not be assured "with a reasonable degree of certainty" that such suspicions would support the is-

suance of a warrant. *See United States v. Ferrara*, 539 F.2d 799, 802 (1st Cir. 1976). That they briefly delayed entry, for less than two hours, in order to mobilize forces at the Railway Museum is inconsequential. *Id.*[21] The failure to make provision before probable cause existed to facilitate obtaining a warrant when that quantum of evidence might arise is likewise not crucial. *Id.* The fact remains that criminal activity was underway and a substantial danger existed that evidence would be removed or culprits would escape unless prompt action was taken. In such circumstances, law enforcement officers, having probable cause, may enter, search and seize without a warrant. *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Juarez*, 573 F.2d 267, 274 (5th Cir. 1978).

b. *The Final Assault on the Dock Area.* In addition to the facts recited above, the observations of Cunniff and Watkins provided further justification for the final assault on the dock area. From their position on the dirt road near the dock area, Cunniff and Watkins observed and heard heavy nonrigid objects being loaded onto trucks which, operating with parking lights only, transported these items from the dock area to the Skillings cottage, where they were unloaded. *See United States v. Clark, supra* at 424–25. On this record, defendants' attack on the existence of probable cause for the agents' assault on the dock area is patently specious. The assault on the dock area and the seizure of the evidence found there were supported by abundant probable cause.[22]

---

**21.** Delays in obtaining warrants which have been found unreasonable involved substantially longer periods of time than the brief period between the events giving rise to probable cause and the warrantless entry in this case. *See McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (information possibly available for months before search); *Trupiano v. United States*, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948) (probable cause existed for weeks); *Niro v. United*

*States*, 388 F.2d 535 (1st Cir. 1968) (police had at least 12 hours to obtain a warrant).

**22.** The agents were, of course, entitled to rely on information known to other officers. It is the collective information of all the officers involved in a particular investigation that is to be considered in making a probable cause determination. *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Clark, supra* at 424–25; *White*

■ Similarly, the arrests of the eight defendants at the dock were completely justified as based on probable cause. Approaching the area, the assault team encountered stacked bales of marijuana and two open pickup trucks with bales in the rear. The defendants were caught red-handed in the act of committing a felony; no arrest warrants were necessary. *United States v. Santana, supra* 427 U.S. at 42–43, 96 S.Ct. 2406; *United States v. Watson*, 423 U.S. 411, 414–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (plurality opinion); *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (dictum); *Trupiano v. United States*, 334 U.S. 699, 705, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); *Marron v. United States*, 275 U.S. 192, 198–99, 48 S.Ct. 206, 72 L.Ed. 1016 (1927). The warrantless seizure of the over 200 bales of marijuana from the dock area and the open vehicles parked there was lawful under the "plain view" exception to the warrant requirement. *Coolidge v. New Hampshire, supra* 403 U.S. at 465–71, 91 S.Ct. 2022; *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (per curiam).

2. *The Onalay*

Only the nine defendants, John Balsamo, Freed, Benedict, Cammisa, Kenneth Jenda, Michael Jenda, Weber, Rossi and Rankin, who are charged in Count II of the indictment with possession of marijuana in violation of 21 U.S.C. § 841(a)(1) have standing to object to the searches of and seizures from the Onalay. Since a substantial quantity of marijuana was seized from the vessel, these nine defendants have automatic standing under the doctrine of *Jones v. United States, supra.*[23] None of the remaining defendants has standing, either actual or automatic, to object to these searches and seizures. *Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565.

■ The initial spot search of the Onalay was permissible in an effort to apprehend criminal confederates, to terminate criminal activities, and to prevent danger to the officers involved. *Warden v. Hayden, supra* 387 U.S. at 298–99, 87 S.Ct. 1642. Eight defendants had been apprehended in the dock area, and the boat was an obvious instrumentality of the crime.

The subsequent warrantless search and seizure of items on board the Onalay was permissible under the federal forfeiture statutes. The officers had abundant probable cause to believe that the Onalay had been used to transport marijuana. Pursuant to 21 U.S.C. § 881(b)(4), a vehicle or a vessel may be seized without a warrant when there is probable cause to believe it has been used or is intended for use in transporting or facilitating the transportation of controlled substances. *United States v. Capra*, 501 F.2d 267, 280 (2d Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424 (1975). *See also United States v. One 1972 Chevrolet Nova*, 560 F.2d 464 (1st Cir. 1977). The authorities have uniformly held that a vehicle so seized may be subsequently searched without a warrant. *United States v. Johnson*, 572 F.2d 227, 230–35 (9th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978); *United States v. Panebianco*, 543 F.2d 447, 456 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. La Vecchia*, 513 F.2d 1210, 1215–16 (2d Cir. 1975); *United States v. Shye*, 473 F.2d 1061, 1065–66 (6th Cir. 1973); *United States v. Edge*, 444 F.2d 1372, 1375 (7th Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 101, 30 L.Ed.2d 97 (1971). While these cases all involve searches of seized vehicles, the statute by its terms applies equally to vessels. 21 U.S.C. § 881(a)(4).

Alternatively, the subsequent search of the Onalay may be justified under the auto-

v. *United States*, 448 F.2d 250, 254 (8th Cir. 1971), *cert. denied*, 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972).

**23.** The five members of the crew of the Onalay, Rankin, Benedict, Michael Jenda, Kenneth Jenda and Weber, who the evidence establishes

had been living aboard the vessel for several weeks, would appear also to have actual standing to contest the searches and seizures on the Onalay under the test announced in *Rakas v. Illinois, supra.*

mobile exception to the warrant requirement. A boat, like an automobile, carries with it a diminished expectation of privacy. *United States v. Miller*, 589 F.2d 1117, 1125 (1st Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *see United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurity opinion); *Cady v. Dombrowski,* 413 U.S. 433, 439–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney,* 399 U.S. 42, 50–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 153–59, 45 S.Ct. 280, 69 L. Ed. 543 (1925). Boats, like automobiles, are subject to frequent limited intrusions by regulatory and safety officials. Such limited intrusions as warrantless safety and documentation checks of vessels are undoubtedly constitutional. *United States v. Miller, supra* at 1125 n.3; *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc); *see United States v. Freeman*, 579 F.2d 942, 946 (5th Cir. 1978). In addition, boats, like automobiles, are inherently mobile. *United States v. Miller, supra* at 1125 n.3; *see United States v. Chadwick, supra; Cardwell v. Lewis, supra; Cady v. Dombrowski, supra; Chambers v. Maroney, supra; Carroll v. United States, supra.* These characteristics—a lessened expectation of privacy and inherent mobility—represent the twofold rationale behind the automobile exception to the warrant requirement. They equally support the warrantless search of a vessel based on probable cause, at least in the circumstances existing in the present case.

■ There remains for comment only defendants' contention that the warrantless opening of the closed but unlocked briefcase found on the Onalay (see note 10 *supra*)

infringed their Fourth Amendment rights. Defendants rely on *United States v. Chadwick, supra*, where the Supreme Court held that the warrantless opening and search of a locked footlocker was impermissible. Although papers belonging to defendants Benedict and Rankin were found in the briefcase, no defendant has claimed a proprietary or possessory interest in the briefcase, nor has any defendant established a reasonable expectation of privacy in the case itself. No contraband was found in the case. None of the defendants, therefore, has standing to raise Fourth Amendment objections to the opening and search of the briefcase. *Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565.[24]

3. *The Russo Residence and the Skillings Cottage*

Only defendants John Balsamo, the lessee, and Michelle Balsamo, the occupant, have actual standing to object to the search of the Russo residence. *Rakas v. Illinois, supra.* Since no contraband was discovered there, none of the remaining defendants are aided by the doctrine of automatic standing. *Brown v. United States, supra* at 229, 93 S.Ct. 1565; *Jones v. United States.* The nine defendants charged in the possession count of the indictment (Count II) have automatic standing to object to the search of the Skillings cottage, since a substantial amount of contraband was found there. *Jones v. United States, supra.* No other defendant has standing, either actual or automatic, to object to the search of the Skillings cottage. *Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565.

■ The entries into and brief searches of the Russo residence and the Skillings cottage were permissible as efforts to ap-

---

**24.** Given the absence of standing to object to the warrantless opening of the seized briefcase, the Court need not decide if the rule of *United States v. Chadwick, supra*, applies. *Compare United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977) *and United States v. Gaultney*, 581 F.2d 1137 (5th Cir.), *rehearing denied*, 586 F.2d 842 (1978) *with United States v. Stevie*, 582

F.2d 1175 (8th Cir. 1978) *and United States v. Schleis*, 582 F.2d 1166 (8th Cir. 1978) (en banc). The Supreme Court has granted certiorari in a case where a warrantless search of a suitcase occurred after it was taken from the trunk of an automobile. *Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978).

prehend criminal confederates, to terminate criminal activity, and to prevent danger to the officers involved. *Warden v. Hayden, supra* 387 U.S. at 298–99, 87 S.Ct. 1642. That the Russo residence was secured from the outside did not guarantee that no one was inside. The presence of Michelle Balsamo within attests to this fact. Similarly, Cunniff and Watkins had earlier observed persons unloading items from pickup trucks into the Skillings cottage. A person had fled the dock area in the general direction of the cottage and curtains were seen to be moving inside. The entries into these houses and the brief interior searches conducted by the officers were totally justified.[25] As has been noted, no evidence was taken from either house on April 27.

\* \* \*

Defendants' motion to suppress the evidence derived from the April 27 searches of the dock area, including the two open pickup trucks parked there, the Onalay, the Russo residence and the Skillings cottage is denied.

## B. *The Pension Ridge Road Roadblock*

The 15 defendants arrested at the Pension Ridge Road roadblock[26] seek to suppress all evidence derived as a result of the stop and search of their vehicle, including

the identification of the occupants and the statements made by defendant Capoziello.[27] They argue that their Fourth Amendment rights were violated because there was no "founded suspicion" on which an investigatory stop of their vehicle could be lawfully made and because there was no probable cause for the subsequent search of the vehicle and their arrests. In addition, Capoziello contends that the statements made by him to DEA Agent Cunniff are inadmissible under the doctrine of *Miranda v. Arizona, supra*.[28] The Court finds no merit in defendants' contentions that the stop and subsequent search and arrests violated the Fourth Amendment, but the Court agrees that Capoziello's statements to Cunniff must be excluded from evidence at trial as against that defendant.

### 1. *The Stop*

 The law governing the constitutional validity of an investigatory stop is undisputed. In *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–81, 95 S.Ct. 2574 (1975), the Supreme Court made clear that a stop of a moving vehicle involves a "seizure" within the meaning of the Fourth Amendment, even if the period of detention is short. *See Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20

**25.** The Government has conceded that the incriminating statements made by Michelle Balsamo following her discovery by the agents inside the Russo residence cannot be used against her at trial, because she had not been given the *Miranda* warnings. *See Miranda v. Arizona, supra. But see Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The Court, therefore, need not analyze the arrest and various questionings of Michelle Balsamo.

**26.** These defendants include Capoziello, the driver of the truck, Striano and Neuer, the two passengers in the front seat, and the 12 defendants discovered in the back of the truck, Calafato, Billi, Jordan, Gorra, Eric Weber, Stingo, Ferrandino, Schulz, Giordano, Oswald, Zwerling and Bottiglieri. The thirteenth defendant found in the back of the truck, Thomas Schaefer, has died since the indictment.

**27.** For the purposes of the present ruling, the Court will assume that all the occupants of the pickup truck stopped on the Pension Ridge

Road have standing to object to the stop and search of the vehicle. *See Rakas v. Illinois, supra* at 4031, 99 S.Ct. 421 (Powell, J., concurring), 4034 n.5 (White, J., dissenting); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). No other defendant has standing, either actual or automatic, to object to the stop and search of this vehicle. *Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565.

**28.** Capoziello is the only defendant who has standing to contest the admissibility under *Miranda* of the statements made by him. Fifth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois, supra* at 4029 n.8, 99 S.Ct. 421; *Couch v. United States*, 409 U.S. 322, 327–29, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *In re Michaelson*, 511 F.2d 882, 889 (9th Cir.), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975); *see Fisher v. United States*, 425 U.S. 391, 396–98, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

L.Ed.2d 889 (1968). Because of the limited nature of the intrusion, however, the Court held that such stops may be justified without a showing of probable cause. *United States v. Brignoni-Ponce, supra* 422 U.S. at 880, 95 S.Ct. 2574; *see Terry v. Ohio, supra* at 22, 88 S.Ct. 1868. The principle that has evolved from *Brignoni-Ponce* is that "a vehicle may be stopped for questioning of the occupants when an officer has specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants." *United States v. Montgomery*, 561 F.2d 875, 879 (D.C. Cir. 1977). Given specific and articulable facts, the investigating officer may question the driver and passengers about their identities and even ask that they explain suspicious circumstances. *United States v. Brignoni-Ponce, supra* 422 U.S. at 881–82, 95 S.Ct. 2574; *Adams v. Williams, supra* 407 U.S. at 145–46, 92 S.Ct. 1921.[29]

■ Applying the foregoing principles, it is beyond question that the officers at the roadblock had specific and articulable facts to justify the initial brief investigatory stop. They were informed at the Railway Museum that a criminal enterprise was afoot, and were given a list of suspect vehicles that included mainly pickup trucks. Pension Ridge Road was one of the few means of access to the Russo property. The pickup truck with a camper cap had all the characteristics of vehicles on the suspect list and was of a type known to be used in drug smuggling operations. The area where the roadblock was set was secluded and remote. The hour was late, the night quiet and dark. The truck that approached the roadblock had retreated for some reason, indicating the possibility of an attempt to escape. These specific and articulable facts gave the

stopping officers more than sufficient grounds to stop and question the occupants of the truck. The investigative stop was clearly lawful under the standards expounded above. *See Adams v. Williams, supra* at 146, 92 S.Ct. 1921.

■ Defendants argue that because the officers approached the truck with guns drawn, the detention constituted an arrest, requiring probable cause, rather than a limited highway stop. The Court disagrees. An armed approach to a stopped vehicle is not by reason of the weapon alone an arrest. *United States v. Worthington*, 544 F.2d 1275, 1280 n.3 (5th Cir.), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 59 L.Ed.2d 72 (1977); *United States v. Maslanka*, 501 F.2d 208, 213 n.10 (5th Cir. 1974), *cert. denied sub nom. Knight v. United States*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975). Rather, in determining whether an investigatory stop amounts to an arrest, the courts look to the reasonableness of the police action in light of the particular circumstances. *Id.* In the present case, the officers knew that a large criminal enterprise was underway. The officers were on a lonely road in a remote area, late at night. They were seeking to identify three young males occupying the front seat of a vehicle which had apparently begun to back away from the roadblock. By drawing their guns as they approached the vehicle, the officers were using proper caution under the circumstances. To do otherwise might be deemed foolhardy.[30] To require an officer to risk death or serious injury in order to make an investigatory stop would run contrary to the intest of *Terry v. Ohio, supra. See Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(per curiam). In short, the officers' approach to the vehicle

---

**29.** As previously noted, it is the collective information of all the officers involved in a particular investigation that is to be considered in assessing the propriety of the stop. *Whiteley v. Warden, supra* 401 U.S. at 568, 91 S.Ct. 1031. Here, the officers at the roadblock were entitled to rely on the information they derived from the Railway Museum meeting. *Id.*

**30.** The Supreme Court has specifically recognized the inordinate risk confronting an officer when approaching a person seated in a vehicle. "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.L.C. & P.S. 93 (1963)." *Adams v. Williams, supra* 407 U.S. at 148 n.3, 92 S.Ct. 1921, 1924 n.3.

with drawn guns did not amount to an arrest requiring probable cause.

### 2. The Search and Arrests

██ In addition to the specific and articulable facts summarized above which justified the stop, the officers had obtained additional information following the stop and the initial questioning of the driver and two front seat passengers. As they approach the vehicle, they observed that the license plate number was on the suspect vehicle list. When Capoziello produced the vehicle registration, they learned that the truck was one of the vehicles suspiciously registered to "Steve Thurston." These additional facts provided the officers with ample probable cause to order the driver and two front seat passengers out of the vehicle and to hold them until Cunniff's arrival. Clearly, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspects] had committed or [were] committing an offense." *Beck v. Ohio, supra* 379 U.S. at 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142. When Cunniff arrived at the scene, all of the factors noted above, combined with his observation that the vehicle had all the characteristics of the three pickup trucks seized at the Russo property, likewise justified his formal arrest of the three defendants for conspiracy to violate the federal narcotics laws and his seizure of the truck pursuant to the federal forfeiture statutes. No arrest warrant was required. *United States v. Watson, supra* 423 U.S. at 414–24, 96 S.Ct. 820; *Gerstein v. Pugh, supra* 420 U.S. at 113, 95 S.Ct. 854 (dictum).

██ As for the 13 passengers who were subsequently discovered in the rear of the truck, the actions of the officers which led to their discovery and arrest were legally permissible by reason of the automobile exception to the warrant requirement. Where probable cause exists to believe that weapons, contraband or criminals will be found in a vehicle, then a warrantless search may ensue even if the vehicle occupants are in police custody. *United States v. Chadwick, supra* 433 U.S. at 12–13, 97 S.Ct. 2476; *Cady v. Dombrowski, supra* 413 U.S. at 439–42, 94 S.Ct. 2464; *Chambers v. Maroney, supra* 399 U.S. at 52, 90 S.Ct. 1975. With adequate probable cause, the search of a locked automobile trunk is also permissible. *Cady v. Dombrowski, supra* at 442–48, 94 S.Ct. 2464; *see Chambers v. Maroney, supra* at 47–52, 90 S.Ct. 1975. Clearly, when Officer Stover looked into the rear of the truck, he had probable cause to believe that contraband or criminals were inside. His actions, in investigating what heavy load made the truck so difficult to handle when he attempted to move it, were entirely reasonable. Having discovered 13 individuals concealed in the rear compartment of the truck, the officers were entitled to arrest them on the spot. It cannot be doubted that these arrests were based on sufficient probable cause.[31]

### 3. Capoziello's Statements

██ The admissibility of the statements made by defendant Capoziello, when questioned by Cunniff before the defendant had been given the *Miranda* warnings, depends on whether at the time of the questioning Capoziello had been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona, supra* 384 U.S. at 444, 467, 86 S.Ct. 1602, 1612; *see Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); *Beckwith v. United States* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). The courts have taken a case-by-case approach, adopting an objective standard, for determining whether an individual is sufficiently in custody to require the protection of *Miranda* warnings. *Fisher v. Scafati,* 439 F.2d 307 (1st Cir.), *cert. denied,* 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971); *Freije v. United States,*

---

**31.** It should be noted that the search of the Pension Ridge Road truck resulted in the discovery of people only. No evidence was seized until the contents of the truck were inventoried at the Scarborough Police Barracks on May 2. *See South Dakota v. Opperman,* 428 U.S. 364, 372–76, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

408 F.2d 100 (1st Cir.), *cert. denied*, 396 U.S. 859, 90 S.Ct. 129, 24 L.Ed.2d 111 (1969). A suspect's subjective belief regarding custody is not controlling,[32] *Freije v. United States, supra* at 103, 90 S.Ct. 129, but rather one must look to see whether there is some "objective manifestation that the defendant was 'deprived of his freedom of action in [a] significant way.'" *Fisher v. Scafati, supra* at 310 (quoting *Miranda, supra* 384 U.S. at 444, 86 S.Ct. 1602).

■ It can hardly be doubted that Capoziello was in custody by the time the questioning by Cunniff took place. Although the detention was relatively brief, he had been ordered out of his vehicle and had been held at gunpoint until Cunniff's arrival. He was not free to leave. Clearly, these "objective manifestations" compel the conclusion that he had been "deprived of his freedom of action in [a] significant way." *Id.; see United States v. Miller, supra* at 1127. Therefore, *Miranda* warnings were required and Capoziello's statements to Cunniff are inadmissible as against him at trial.[33]

\* \* \*

Defendants' motion to suppress the evidence derived from the stop and search of the truck at the Pension Ridge Road roadblock is denied. The motion of defendant Capoziello to suppress the use of the statements made by him to Cunniff in the Government's case against that defendant is granted.

## C. *The Route 1 Stops*

The four defendants arrested on Route 1—defendants Prinzo, Velox, Aprea and Dima—seek to suppress all evidence resulting from the two stops and searches of their vehicle, including the identification of the occupants and the statements made by them to the officers.[34] Like the defendants apprehended on the Pension Ridge Road, these defendants contend that their Fourth Amendment rights were violated because there was no sufficient justification for the stops and because there was no probable cause for the subsequent searches of the vehicle and their arrests. There is no merit in defendants' contentions.

### 1. *The First Stop*

■ Having clocked the truck traveling well in excess of the speed limit, Bath Police Officer Cohen's initial stop of the vehicle for speeding was specifically authorized by 29 Me.Rev.Stat.Ann. § 1252 and 30 Me.Rev.Stat.Ann. §§ 2361(2), 2364. The subsequent inspection of the interior of the truck by Sergeant Haggett, who joined Cohen, and the discovery of defendant Dima and a large quantity of food were permissible because the driver, defendant Prinzo, voluntarily consented to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 231, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Horton*, 488 F.2d 374, 380 n.6 (5th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). Prinzo himself opened the rear door of the truck's camper cap. Nothing about his age, intelligence, education or demeanor suggests that the permission for the search was not knowingly and voluntarily given. *Schneckloth v. Bustamonte, supra* 412 U.S. at 226, 93 S.Ct. 2041. The statements made by defendants to Cohen and Haggett are admissible evidence since defendants were not in custody at the time of questioning and *Miranda* warnings were not required. *See Oregon v.*

---

**32.** There is no evidence whatsoever as to Capoziello's subjective belief with regard to his detention.

**33.** *Miranda* does not bar the admission in evidence of statements made by the defendants in the back of the truck, since the evidence discloses that the *Miranda* warnings had been previously given to them.

**34.** For the purposes of the present ruling, the Court will assume that all four of the defendants who were found in the pickup truck stopped on Route 1 have standing to object to the stops and searches of the vehicle. *See Rakas v. Illinois, supra* at 4031, 99 S.Ct. 421 (Powell, J., concurring), 4034 n.5 (White, J., dissenting); *United States v. Brignoni-Ponce, supra.* No other defendant has standing, either actual or automatic, to object. *Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565.

*Mathiason, supra* 429 U.S. at 494–95, 97 S.Ct. 711. Defendants' Fourth Amendment rights were in no way violated by any actions of the officers at the first stop.

### 2. *The Second Stop*

■ As noted above (see Part II. B. 1., *supra*), a law enforcement officer may stop a vehicle for questioning of the occupants when the officer has specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrants suspicion of criminal conduct on the part of the occupants. *United States v. Brignoni-Ponce, supra* 422 U.S. at 884, 95 S.Ct. 2574; *Adams v. Williams, supra* 407 U.S. 145–46, 92 S.Ct. 1921; *Terry v. Ohio, supra* 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Montgomery, supra* at 879. Clearly, the officers who effected the second stop of the pickup truck on Route 1 had specific and articulable facts to justify an investigatory stop.

One of the stopping officers, Sergeant Haggett, had been at the scene of the earlier speeding stop, and had heard the confused answers and questions of the occupants. Haggett then had followed the vehicle, noting that it did not pay attention to his directions, and after proceeding south toward Brunswick, reversed direction and again headed north. By the time the truck reached the intersection of Route 1 and Route 27, the first cutoff to the Boothbay area, Cunniff had been notified of the earlier detention. At his direction, transmitted through Colonel Weeks, the truck was stopped a second time on Route 1 in Newcastle.[35] Adequate facts unquestionably supported Cunniff's instruction to stop the truck, and the officers were entitled to rely on Cunniff's information. *Whiteley v. Warden, supra* 401 U.S. at 568, 91 S.Ct. 1031. Cunniff was acutely aware of the evening's activities prior to his request. He had participated in the arrests and seizures

at the Russo property and the Pension Ridge Road roadblock. He also had been informed, before instructing the stop of the vehicle, that the registration number of the Route 1 truck was on the suspect vehicle list, and he was aware that its description matched the vehicles seized earlier that night. The vehicle was stopped prior to the River Road turnoff for Boothbay, one of the routes for going to the Russo property. Indeed, it could even be said that probable cause existed by this time. *See Beck v. Ohio, supra* 379 U.S. at 91, 85 S.Ct. 223. Thus, the stop of the vehicle in Newcastle and the brief detention of the driver and passengers were lawful.

The search of the vehicle at the second stop, performed by DEA Agent Steadman, was, like the earlier search, a valid consent search under the principles delineated by the Supreme Court in *Schneckloth v. Bustamonte, supra*. After being told that Steadman was a federal narcotics officer, and being asked if he would agree to a search, Prinzo, the driver, responded that the truck was open and Steadman was welcome to look inside. Obviously, such a statement amounts to a voluntary consent to search. *Id.* 412 U.S. at 227–34, 93 S.Ct. 2041. There is no evidence that Prinzo was threatened or intimidated in any way, physically or psychologically, or that the officers made any promises or engaged in trickery or any other more subtle form of coercion that may have affected Prinzo's judgment. *See United States v. Watson, supra* 423 U.S. at 424–25, 96 S.Ct. 820; *United States v. Juarez, supra* at 273. Nor is there anything in the record that indicates anything about Prinzo's age, intelligence, education or demeanor that would render his otherwise free consent involuntary. *See United States v. Watson, supra* 423 U.S. at 424–25, 96 S.Ct. 820; *Schneckloth v. Bustamonte, supra* 416 U.S. at 226, 93 S.Ct. 2041.

**35.** At least two state statutes gave Haggett authority to take the requested action even outside his jurisdiction. See 25 Me.Rev.Stat. Ann. § 1502 (commanding the cooperation of state and local authorities in the arrest and prosecution of criminals); 30 Me.Rev.Stat.Ann.

§ 1002 ("any officer" may request any person to aid him in apprehending suspects in the execution of his official duties in criminal and traffic infraction cases—failure or refusal to comply with such a request can result in a fine).

■ Ample probable cause existed to place the driver and passengers of the truck under arrest and to seize the vehicle. In addition to the information available to Cunniff and attributable to the arresting officers, Steadman's search of the back of the truck revealed two large industrial vacuum cleaners, known by him to be of a kind typically used to clean up debris after the transportation of a large amount of marijuana, and large quantities of unrefrigerated, but perishable, food items, suitable to replenish a vessel's stores. Discovery of Prinzo's bogus second driver's license further suggested clandestine activity. The truck's route was consistent with going to the Russo property via the River Road. Without question, Steadman had probable cause both to arrest the occupants and to seize the vehicle.

The statements made by the defendants at this stop are also admissible. The record does not disclose any questioning of defendants prior to Steadman's search of the vehicle. Immediately after the search, Steadman read the four defendants their *Miranda* rights, making sure that each acknowledged and understood them. Thus, the statements made by defendants thereafter are admissible. *Miranda v. Arizona, supra* 384 U.S. at 436, 86 S.Ct. 1602.

* * *

Defendants' motion to suppress the evidence resulting from the two stops and searches of the truck on Route 1 is denied.[36]

### D. *The Portland Holiday Inn Arrests*

■ Defendants Ange and Rosen seek to suppress all evidence derived from their arrests by Portland police officers at the Portland Holiday Inn on the afternoon of April 27.[37] They argue that their Fourth Amendment rights were violated because there was no sufficient justification for the search of their persons and no probable cause for the arrests. They contend that any evidence obtained therefrom, including any statements made by them and the discovery of the green Chevrolet pickup truck, was tainted by the unlawful searches and arrests. The Court must agree.

The only possible basis for the searches and arrests of Ange and Rosen was the note discovered in Capoziello's pocket while he was being processed at the United States Courthouse.[38] The note indicated only that Capoziello was acquainted with a man named "John" staying at the Portland Holiday Inn. This single fact known to the officers, which established no more than possible friendship and association between Capoziello and "John," was clearly insufficient to support either a determination of "founded suspicion" for the searches, *see Terry v. Ohio, supra* 392 U.S. at 21, 88 S.Ct. 1868 or a finding of probable cause justifying the arrest of these two defendants. *Sibron v. United States*, 392 U.S. 40, 62, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Chadwick*, 532 F.2d 773, 784 (1st Cir. 1976), *aff'd*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *see United States v. Jit Sun Loo*, 478 F.2d 401, 404–05 (9th Cir. 1973). *See also United States v. Di Re*, 322 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *United States v. Barber*, 557 F.2d 628 (8th Cir. 1977); *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974).

It may be conceded that the officers' entry into the motel room was a lawful

---

**36.** No evidence was seized from the Route 1 truck until May 2, when an inventory was taken at the State Police Barracks. *See South Dakota v. Opperman, supra* 428 U.S. at 372–76, 96 S.Ct. 3092.

**37.** Only defendants Ange and Rosen have standing to object to this police conduct. *Rakas v. Illinois, supra; Brown v. United States, supra*, 411 U.S. at 229, 93 S.Ct. 1565.

**38.** The officers' discovery and use of the note found on Capoziello was, of course, permissible. Capoziello having been validly arrested, a reasonable warrantless search of his person was permissible. *United States v. Edwards*, 415 U.S. 800, 804–05, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *Gustafson v. Florida*, 414 U.S. 260, 266, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Sheehan*, 583 F.2d 30 (1st Cir. 1978). In any event, only Capoziello has standing to contest the search of his person. *Rakas v. Illinois, supra; Alderman v. United States, supra*, 394 U.S. at 174, 89 S.Ct. 961.

consensual entry. *Robbins v. MacKenzie*, 364 F.2d 45, 49–50 (1st Cir.), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966).[39] The officers, however, did not make any additional observations once inside the room which would justify the ensuing frisks and arrests. In *Terry v. Ohio, supra*, the Supreme Court approved a limited search of suspects—a pat-down for weapons—only when the police officer can "point to specific and articulable facts which, taken together with rational inferences . . . reasonably warrant" a suspicion of criminal activity or a belief that one's safety or that of others is in danger. *Id.* 392 U.S. at 21, 88 S.Ct. 1868, 1880. *See also United States v. Brignoni-Ponce, supra.* Specific and articulable facts were lacking in this instance. It follows that probable cause was also nonexistent.

It cannot be doubted that the subsequent discovery of the vehicle keys and the vehicle itself, as well as the incriminatory statements made by these defendants subsequent to their arrests, were tainted by the primary illegality. As "fruits of the poisonous tree," this evidence and these statements, therefore, must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Clearly, the taint was not purged, *Wong Sun v. United States, supra* at 488, 83 S.Ct. 407 nor were the keys or the vehicle discovered from an independent source. *Id.* at 485, 487, 83 S.Ct. 407. The fact that *Miranda* warnings had been given to defendants prior to their questioning by the officers at the Holiday Inn and by DEA Agent Drinan at the United States Courthouse did not cure the Fourth Amendment violation. *Brown v. Illinois*, 422 U.S. 590, 600–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Chadwick, supra*, 532 F.2d at 785.[40]

\* \* \*

The motion of defendants Ange and Rosen to suppress the evidence derived from their arrests at the Portland Holiday Inn, including any statements made by them, is granted.

### E. *The Warrant Searches*

Defendants seek to suppress all the evidence seized pursuant to search warrants on the evening of April 28. They contend that their Fourth Amendment rights were violated: (1) because the supporting affidavits did not establish sufficient probable cause for the issuance of the warrants; (2) because the search warrants were not sufficiently specific in describing the items to be seized; and (3) because the warrants were not properly executed. None of defendants' contentions have merit.

The eight warrants in question were issued by the federal magistrate in Portland between 9:00 and 9:30 p. m. on April 28. The warrants authorized daytime searches (6:00 a. m. to 10:00 p. m.). Fed.R.Crim.P. 41(c) and (h). Each warrant was supported by the same affidavits of DEA Agent Cunniff and DSI Agent Watkins, and each permitted seizure of the same items.[41] Three warrants authorized searches of the Russo house at Blue Hill Shores, the red Dodge pickup truck which had been found padlocked in the driveway of the Russo house, and the nearby Skillings cottage. Two warrants authorized searches of the Carrazzo house at Knickerbocker Lake, and the black Chevrolet pickup truck which had

---

**39.** The fact that the officers smelled marijuana in the hallway did not justify their entry into this particular room, since they concede that they were unable to determine the room from which the smoke emanated.

**40.** "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Brown v. Illinois, supra* at 602, 95 S.Ct. 2254, 2261 (citation omitted).

**41.** All eight warrants authorized seizure of the following property:

marijuana; scales; packing and packaging material and devices, including but not limited to burlap bags and plastic trash bags; documents; notes; books; ledgers; maps and charts, which are the fruits, instrumentalities and evidence of the crimes of conspiracy to possess marijuana with intent to distribute and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

been found parked there. Three warrants authorized searches of the Scoriello house in Bayville, and the gold Plymouth Fury and green Chevrolet pickup truck which had been found parked in the driveway of that house.

■ At the outset, it must be noted that not all defendants have standing to raise Fourth Amendment objections to these warrant searches under the standard recently announced by the Supreme Court in *Rakas v. Illinois, supra.* John Balsamo, the lessee, and Michelle Balsamo, the occupant, have actual standing to object to the search of the Russo house, and Cammisa, the lessee, has actual standing to object to the search of the Carrazzo house. *Id.; Brown v. United States, supra* at 229. The nine defendants named in the possession count of the indictment (Count II) have automatic standing to contest the search of the Skillings house, since marijuana bales were seized there. *Jones v. United States, supra.* No other defendant has established standing, either actual or automatic, to object to the searches of the four houses or the four vehicles. *Rakas v. Illinois, supra; Brown v. United States, supra* 411 U.S. at 229, 93 S.Ct. 1565.

### 1. *The Sufficiency of the Affidavits*

■ Defendants contend that the supporting affidavits did not establish sufficient probable cause for the issuance of the warrants. This argument borders on the frivolous. There can be no question that the search warrants were supported by an ample showing of probable cause. The supporting affidavits submitted by Cunniff and Watkins to the magistrate related in detail the facts, recited above, which were known to the officers as a result of their prior investigation and surveillance of the Russo, Scoriello and Carrazzo properties and the raid upon the Russo property the previous day, which resulted in the arrests of a number of suspects and the seizure of many tons of marijuana and the vehicles to be searched. The specific facts recited in the supporting affidavits clearly furnished a substantial basis for the magistrate to con-clude that instrumentalities and evidence of a conspiracy to possess with intent to distribute marijuana would likely be found in the houses and vehicles where the warrants authorized searches. *See Aguilar v. Texas, supra* 378 U.S. at 111, 84 S.Ct. 1509; *United States v. Ventresca, supra* 380 U.S. at 106, 85 S.Ct. 741.

Relying on *Franks v. Delaware, supra,* defendant John Balsamo argues that the warrant for the search of the Russo house must be controverted because of the failure of the affidavits to inform the magistrate that no contraband had been found there when the agents entered the house on the previous day. In order to attack a search warrant under *Franks,* however, a defendant must make a substantial showing that a misstatement or omission in a supporting affidavit was necessary for the finding of probable cause, and was either knowingly and intentionally false or in reckless disregard of the truth. *Id.* 438 U.S. at 155–56, 98 S.Ct. 2674, *United States v. Cruz,* No. 78–1146, 594 F.2d 268 at 271–273 (1st Cir. Mar. 9, 1979). No such showing has been made here.

### 2. *The Scope of the Warrants*

■ Defendants contend that the search warrants were not sufficiently specific in identifying the items to be seized because they did not particularly describe the "documents, notes, books, ledgers, maps and charts, which are the fruits, instrumentalities and evidence of the crimes . . . ." This claim has no merit. "When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking. The degree of specificity, thus, must vary with the circumstances and with the type of items to be seized." *Spinelli v. United States,* 382 F.2d 871, 886 (8th Cir. 1967), *rev'd on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *accord Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d 324, 326 (1st Cir. 1978); *United States v. Klein,* 565 F.2d 183, 189

(1st Cir. 1977); *United States v. Scharfman*, 448 F.2d 1352, 1354 (2d Cir. 1971), *cert. denied*, 405 U.S. 919 (1972); *Calo v. United States*, 338 F.2d 793, 794 (1st Cir. 1964). This is precisely the case here. The documents authorized to be seized were only those relating to the crimes of conspiracy to possess and possession of marijuana. The generic description of items to be seized is sufficient, and more specificity could not be properly expected.

### 3. *The Execution of the Warrants*

Defendant John Balsamo claims that all items seized in the search of the Russo house must be suppressed because the officers were not guided by the warrant and conducted an unlawful general exploratory search. The evidence presented at the hearing, however, is to the contrary. Agent Steadman's testimony shows that the officers conducted a preliminary examination of the documents found at the house prior to seizure. The only items taken were those which they felt might be instrumentalities or evidence of the conspiracy charged. The various documents that are the subject of this motion to suppress[42] all fit within the generic description contained in the warrant. It was reasonable for the agents to conclude that they were within the scope of the warrant. *See United States v. Scharfman, supra* at 1354–55; *United States v. Auterbridge*, 375 F.Supp. 418, 420 (S.D.N.Y.1974). Defendant's reliance on *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978), is misplaced. The present record establishes that the officers confined their search in good faith to the objects specified in the warrant. *See Harris v. United States*, 331 U.S. 145, 153–54, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *Gurleski v. United States*, 405 F.2d 253, 256–60 (5th Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2127, 23 L.Ed.2d 765 (1969).

Finally, that the searches of the residences were not completed until after 10:00 p. m. is not fatal. Searches which begin during daytime and continue into the night are permissible, at least where no invasion of privacy or prejudice has been shown. *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1977); *United States v. Woodring*, 444 F.2d 749, 751 (9th Cir. 1971); *United States v. Joseph*, 278 F.2d 504 (3d Cir.), *cert. denied*, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960). As for the searches of the vehicles, which did not commence until after 10:00 p. m., no defendant has standing to object. In addition, no substantial rights of defendants were affected by the delay in executing these warrants. *United States v. Ravich*, 421 F.2d 1196, 1201 (2d Cir.) (Friendly, J.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970); Fed.R. Crim.P. 52(a). *But cf. United States ex rel. Boyance v. Myers*, 398 F.2d 896, 899 (3d Cir. 1968) (2:00 a. m. search of occupied residence).

\* \* \*

Defendants' motion to suppress the evidence seized pursuant to search warrants on April 28 is denied.

### III

### ORDER

The motion of defendant Capoziello to suppress the use as against him of the statements made by him to DEA Agent Cunniff is granted. The motion of defendants Ange and Rosen to suppress the use as against them of the evidence derived from their arrests at the Portland Holiday Inn, including any statements made by them, is granted. In all other respects, defendants' motion for suppression of evidence is denied.

IT IS SO ORDERED.

---

42. Other items taken by the officers which the Government has stated it will not offer in evidence are not the subject of this motion.