UNITED STATES of America

v.

Robert D. CRESTA, et al.

Crim. No. 84–0009–B.

United States District Court,
D. Maine.

July 30, 1984.

**892**

Richard S. Cohen, U.S. Atty., Joseph H. Groff, III, Asst. U.S. Atty., Portland, Maine, for U.S.A.

Philip Castleman, Springfield, Mass., for defendant Robert T. Cresta.

Joseph Flak, Boston, Mass., for defendant John J. Gillen, Jr.

Jeffrey A. Thaler, Richardson, Tyler & Troubh, Portland, Maine, for defendant Douglas A. Hardy, Jr.

Daniel Barrett, Cloutier, Barrett, Cloutier & Conley, Portland, Maine, for defendant Douglas A. Hardy, Sr.

Ronald Chisholm, Boston, Mass., for defendant Richard T. Ford.

Neal L. Weinstein, Old Orchard Beach, Maine, for defendant Edward W. McCauley.

David C. Pomeroy, Portland, Maine, for defendant Manford J. Porter.

John S. Campbell, Portland, Maine, for defendant George B. Trundy.

Dan Warren, Bean, Sawyer & Warren, Scarborough, Maine, for defendant Edward Joseph Welch, Jr.

Mark Dunlap, Dunlap & O'Brien, Portland, Maine, for defendant Ernesto Agudelo.

Brian F. Gilligan, Milton, Mass., Julio C. Codias, Miami, Fla., for defendant, Gabriel Caravajal.

John C. McBride, Boston, Mass., for defendant Guido Impemba.

Robert J. Wheeler, Jr., Boston, Mass., for defendant Sherree Rogers.

Stephen Weymouth, Boston, Mass., for defendant John Doe No. 1 Anthony Gravallese.

Paul Buckley, Milton, Mass., for defendant John Doe No. 3 Marino Sarno.

## MEMORANDUM OF OPINION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

GIGNOUX, District Judge.

Eighteen defendants are charged in a two-count indictment with conspiracy to possess with intent to distribute more than 1000 pounds of marijuana in violation of 21 U.S.C. §§ 846, 841(b)(6) (Count I) and with conspiracy to import a large quantity of marijuana into the United States in violation of 21 U.S.C. §§ 960, 963 (Count II). Presently before the Court are defendants' motions to suppress evidence pursuant to Fed.R.Crim.P. 12(b)(3) and 41, treated as adopted by all defendants. An evidentiary hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the Court's findings of fact and conclusions of law as required by Fed.R.Crim.P. 12(e).

# I.

## The Facts

### A. The Preliminary Investigation

The investigation that led to the instant indictment began in early November 1983. On November 6, 1983, agents of the Drug Enforcement Administration (DEA) in Boston informed DEA Special Agent Michael Cunniff of the joint DEA/Maine State Police (MSP) Anti-Smuggling Task Force that they anticipated the arrival of a large shipment of marijuana along the Maine coast. From the Boston agents, Cunniff learned that defendant Manford Porter, a 6'5" fisherman from Gloucester, Massachusetts, acting under the direction of defendant Guido Impemba and several Colombians, including defendants Gabriel Caravajal, Ernesto Agudelo and Israel Acevedo, was suspected to be in charge of arranging for the marijuana to be unloaded and delivered into the United States. By late November, Cunniff was informed that the Boston agents had information that a large coastal vessel named "Adina" or "Hadina" was en route from Colombia and would be met by fishing vessels which would transport the marijuana to an offloading site in Maine. On December 6, a Coast Guard aircraft located a vessel named "Adina" in the Gulf of Maine at 41 degrees 40 minutes latitude north by 66 degrees longitude west. Thereafter, Coast Guard aircraft continued surveillance of the vessel.

Independently, on December 9, a Rockland, Maine fisherman named Robert Kenney, who had been arrested in connection with a previous marijuana smuggling prosecution in Maine, met with Cunniff, Trooper Leslie Bridges (MSP) and Trooper Michael Vittum (MSP) at the United States Attorney's Office in Bangor. Kenney reported that defendant George Trundy had contacted him on December 4, and was looking for a fishing boat and crew to transport 50,000 pounds of marijuana from a mothership to a herring pumping station in Rockland. Trundy described the vessel to Kenney as a large blue freighter with a white wheelhouse located 200 miles off the Maine coast at 66 degrees west longitude by 42 degrees north latitude. Trundy told Kenney that he was working for a fisherman from Gloucester called "Manny" who was "big, tall, rugged and mean." Trundy planned to take some of the marijuana to Wooden Ball Island in Penobscot Bay and was looking for someone to take the remaining marijuana to a herring pumping station near Sea-Pro, Inc. in Rockland, where it would be transferred to a tractor trailer. According to Trundy, the transfer of marijuana at sea was expected to take place on the afternoon or night of December 10.

Based upon this information, Cunniff advised DEA Group Supervisor Ronald Garabotto in Boston to contact the Coast Guard. In response to a request by Garabotto, the Coast Guard dispatched the U.S. Coast Guard Cutter Unimak to the location in the Gulf of Maine reported to Kenney by Trundy. In the early morning of December 10, the Coast Guard intercepted and boarded the Adina and discovered approximately 1000 bales which tested positively for marijuana hidden in the holds under a load of cement. The Coast Guard relayed this information to the investigating agents in Maine.

Meanwhile, on land, officers investigating the Rockland area became suspicious when they observed a meeting between the occupant of a blue 1983 Dodge Aries (Mass. # 644–572) and three occupants of a blue Renault (N.H. # 221–955) at 2:30 p.m., December 10, in the parking lot of a Burger King Restaurant on Route 1 in Rockland. Cunniff arrived at the Burger King at about 2:45 p.m. with Corporal Terrance Parsons and Trooper Vittum in time to observe two of the individuals in the Renault. He later identified these individuals as defendants Impemba and Agudelo.

### B. The Kenney Tapes

At the December 9 meeting at the United States Attorney's Office in Bangor with Cunniff, Bridges and Vittum, Kenney agreed to allow the agents to record his telephone conversations with the suspected conspirators. In exchange for his coopera-

tion, Cunniff promised to inform the sentencing judge in the pending smuggling prosecution of Kenney's assistance and to recommend to that judge that Kenney serve his prison sentence at a designated institution. Cunniff explained the equipment that was to be used to record the conversations, and Kenney said he understood and agreed. Thereafter, the officers recorded seven telephone calls placed by Kenney on December 9 and 10. Before each call the same procedure was followed, and Kenney gave his consent to the recording.

Kenney made the first consensually-recorded telephone call from the Bangor United States Attorney's office to Trundy's residence in Stonington, Maine at 3:40 p.m. on December 9. During that call, Kenney discussed weather conditions with Trundy and agreed to speak with him again the next day. On December 10, at 1:40 p.m., Kenney placed a second consensually-recorded call to Trundy from the DEA command post at Room 129 of the Samoset Hotel in Rockland. Trundy said he had been working on his boat and Kenney arranged to call him at another number later.

At 2:50 p.m. on December 10, Kenney placed a third consensually-recorded call from the Samoset Hotel to Trundy at a number listed to a pay phone in Rockland. Trundy speculated as to the time the mothership would reach the rendezvous point in the Gulf of Maine and told Kenney that the vessel was in radio contact with people in New Hampshire. Trundy also discussed preparations for offloading the marijuana once it reached shore. He reported that people who would help unload the vessel and load the tractor trailer were staying at the Navigator Motel in Rockland under the name Green. According to Trundy, the tractor trailer operator planned to leave the trailer on the dock and would tell the watchman that he was waiting for a load of frozen herring.

At 5:03 p.m. on December 10, Kenney spoke again with Trundy in a fourth consensually-recorded telephone conversation from the Samoset Hotel. Trundy said he still was having problems with his boat and was thinking of meeting the mothership in a 40-foot open Novi boat instead. He told Kenney that the driver of the tractor trailer would leave for Rockland upon a signal from Trundy. When asked by Kenney, Trundy said that his contact at the Navigator Motel was someone named "Manny" and that he was registered under the name Jack Green. At 5:35 p.m. on December 10, Kenney placed a fifth consensually-recorded call from the Samoset Hotel to Trundy in which Trundy said that the offloading crew at the Navigator Motel was in Room 106 and had changed the room registration to the name Parker. Trundy then instructed Kenney to call the Navigator and ask for Mr. Parker. In this conversation, Trundy described the tractor trailer driver in greater detail as a young man named Doug with a beard, glasses and a squeaky voice. At the end of the conversation, Trundy and Kenney arranged to meet later at the Wayfarer Lounge in Rockland.

Following Trundy's instruction, Kenney placed a sixth consensually-recorded call from the Samoset Hotel to the Navigator Motel at 6:00 p.m. on December 10 and asked for Mr. Parker. "Parker" said he had been waiting for Kenney and wanted to meet with him. To enable Kenney to recognize him, "Parker" described himself as wearing a plaid jacket and said he was sitting in the piano lounge of the Navigator Motel near the ladies' room with one or two others and eating chicken wings.

Based on the information obtained through Kenney, investigating agents established surveillance in the lounge of the Navigator Motel. At approximately 6:15 p.m. on December 10, Vittum, Parsons and Trooper Charles Stevens (MSP) observed a large 6'5" man, later identified as defendant Porter, wearing a plaid jacket and seated at a table with a shorter man with gray hair and a beard, later identified as defendant Robert Cresta. Two others at a nearby table were later identified as defendants Richard Ford and John Gillen. The three MSP officers saw Kenney arrive at the lounge and then leave with Porter and

Cresta. At 6:40 p.m., the three men returned to the Navigator Motel in Kenney's truck.

Trooper Bridges met with Kenney a short time afterwards. Kenney reported to Bridges that the two men had asked as they were leaving the lounge whether he knew the three officers; Kenney had replied that he didn't. Kenney told Bridges that they had gone in his truck to inspect the offloading site at the herring pumping station. Cresta, who according to Kenney had done most of the talking, expressed displeasure upon viewing the location. At 6:45 p.m., Vittum, Parsons and Stevens met with Cunniff and related to him the information Kenney had provided.

At 7:57 p.m., Kenney made a final call from the Samoset Hotel to Room 106 at the Navigator Motel. An unidentified male voice answered the phone and said that Trundy had not yet arrived and that "we" would be waiting for him in the room.

## C. The Events of the Night of December 10–11

Based on information obtained through Kenney's recorded conversations, law enforcement agents set up observation posts at several Rockland locations during the evening of December 10. At about 10:40 p.m., Cunniff, driving with Parsons in an unmarked government car, saw a man 6'5" tall wearing a plaid jacket making a telephone call from a pay phone in the parking lot of Sampson's Supermarket directly across from the Wayfarer Lounge. Cunniff observed that the individual entered a blue 1983 Dodge Aries with a Massachusetts registration, matching the description of one of the cars spotted earlier that day at the Burger King restaurant. Parsons recognized the man as the same individual he had seen earlier in the lounge of the Navigator Motel. Losing sight of the Dodge Aries after it left the parking lot, the agents later located it at 10:30 p.m. in the parking lot of the Trade Winds Motel in Rockland.

At 11:35 p.m., Troopers Stevens and Steven Spaulding (MSP) went to the Wayfarer Lounge. They observed a blue Chevrolet pickup truck (Me. # 223–667) with a yellow rotating beacon light drive into the parking lot. The driver of the pickup was a man subsequently identified as defendant Douglas Hardy, Sr. As Spaulding watched, Trundy exited from the passenger side of the truck and entered the bar, where he met Kenney. At about 11:45 p.m., DEA Special Agent Wayne Steadman reported to Cunniff that he had met with Kenney, who had told him that he had met with Trundy outside the Wayfarer Lounge and had learned that five or six "lumpers" would help unload the marijuana. Trundy had also told Kenney he was on his way to the Navigator Motel and that Kenney should meet him there.

Between 12:30 and 3:00 a.m. on December 11, Parsons and Vittum stationed themselves near the herring pumping station. From this vantage point, they observed the blue Chevrolet pickup truck with a yellow light repeatedly coming and going from the offloading site. At about 1:30 a.m., Cunniff, in a car with Bridges, Spaulding and Stevens, saw a Ryder rental tractor trailer rig in the parking lot of King's Department Store on Route 1 in Rockland. Taking up a position in a car dealership midway along Route 1 between the King's parking lot and the herring pumping station, Cunniff and the three troopers observed the blue pickup traveling back and forth along Route 1. Spaulding recognized the pickup as the one he had seen earlier at the Wayfarer Lounge. From radio communications with Vittum and Parsons, they learned that each time Vittum and Parsons reported the blue pickup leaving the herring pumping station, they would see it traveling north along Route 1 a few moments later. From the King's parking lot, Sergeant Peter McCarthy (MSP) reported seeing the blue pickup near the Ryder tractor trailer. The officers observed little other traffic on the road.

At about 3:00 a.m., Cunniff gave a signal to an undercover fishing vessel containing eleven law enforcement officers and several bales of marijuana that it should begin

approaching the herring pumping station. At this time, Vittum and Parsons reported that the blue pickup was heading toward the dock. From the fishing vessel, Sergeant Ronald Moody (MSP) radioed that he saw a vehicle approach the dock, turn off its headlights and shortly afterwards leave the dock area. A few moments later, Vittum and Parsons noted that the blue pickup was leaving the offloading site, heading toward downtown Rockland.

Suspecting that the blue pickup had gone to notify the offloading crew, Cunniff instructed McCarthy to interview the driver of the Ryder tractor trailer rig, who was later identified as defendant Douglas Hardy, Jr.

D. The Entry into Room 56 at the Trade Winds Motel and the Arrest of Defendants Porter, Gillen, McCauley and Welch

Cunniff, with Bridges, Spaulding and Stevens, attempted to follow the blue pickup as it proceeded toward downtown Rockland. They drove past the Navigator Motel, but did not find it there. Driving on, in the parking lot of the Trade Winds Motel, they saw the blue Dodge Aries (Mass. # 644–572) observed earlier and the blue pickup (Me. # 223–667) with defendant Hardy, Sr. seated behind the wheel.

As the agents drove into the parking lot of the Trade Winds Motel, they saw defendant Trundy approaching the blue pickup from the second floor balcony of the motel, where moments earlier Spaulding had observed him emerging from either Room 56 or 57. Cunniff approached Trundy, identified himself as a DEA agent, and placed him under arrest. Meanwhile, Bridges arrested Hardy, Sr. While Cunniff was arresting Trundy, Cunniff looked up and made eye contact with a 6'5" individual watching from the second floor balcony. The door to Room 56 was open and the lights were on. Transferring Trundy to Stevens' custody, Cunniff went up to the second floor followed closely by Spaulding.

Upon reaching the second floor, the officers noticed that the large man seen from below was no longer on the balcony and the door to Room 56 was closed with the lights off and the curtains drawn. Wearing his DEA badge and a reflecting DEA armband, Cunniff knocked at the door to Room 56. After a delay, a voice responded, "Who's there?" from inside the room. Cunniff identified himself as police and said he wanted to talk with the occupants of the room. A delay of about one minute followed, and then the door opened about four to five inches. Cunniff identified himself again and asked the large man holding the door to turn on the lights. Once the lights were on, Cunniff recognized the large man wearing a plaid jacket holding the door as the man he had previously seen on the balcony. As the man tried to close the door, Cunniff placed his foot in the door and forced it open. Cunniff and Spaulding then entered the room.

Upon entering the room, the officers saw four individuals: defendant Porter, the large man who had been holding the door; a man seated on the bed closer to the door, later identified as defendant John Gillen; and two men seated at opposite ends of the bed further from the door, later identified as defendants Edward McCauley and Edward Welch. Cunniff noticed two portable two-way Motorola radios lying on a table. Recognizing Porter's voice as that of the man who had identified himself as "Parker" in Kenney's sixth taped telephone conversation, Cunniff instructed him to place his hands against the wall. As Porter swung away from the wall to face Cunniff, the agent drew his revolver. All four defendants were placed under arrest and advised of their *Miranda* rights. When asked their names, Gillen said he was Jack Gillen, Welch gave the name Edward Kelly, and McCauley identified himself as Edward Johnston. Since no handcuffs were available, none of the defendants was physically restrained.

A short time later, Agent Garabotto and Troopers Stevens and Bridges joined Cunniff and Spaulding in the motel room. They were advised that no security check of either the defendants or the room had

been performed. About five minutes later, Cunniff and Garabotto and Spaulding left for the Navigator Motel. Stevens and Bridges remained with the four defendants until Agent Steadman and another officer arrived about 4:00 a.m., handcuffed Porter and Gillen and led them away.

While the remaining two defendants and two officers were waiting in the room, Stevens saw the butt of a handgun underneath the bed closer to the door. He did not pick it up but positioned himself between the defendants and the weapon. Attempting to determine if there were other weapons in the room, Stevens began patting down items on top of and under the desk and dresser. In a partially open suitcase in the kneehole of the dresser, he felt two other weapons. He did not remove any of the guns from where he had first seen or felt them, but placed himself between the defendants and the weapons. Stevens also observed a registration receipt for the motel on top of the dresser. In the bathroom, he found a small glass vial containing white powder on the floor. The vial was open and some of the powder had spread on the bathroom floor. In an open cubbyhole in the nightstand, Stevens saw a plastic bag containing a green leafy material. About ten minutes after the first two defendants had been removed, Agent Steadman returned with another officer. McCauley and Welch were handcuffed and taken to the Sheriff's office. Stevens found a Smith & Wesson .357 magnum revolver contained in a navy watchcap hidden between the mattress and the box spring of the bed on which McCauley and Welch had been sitting.

Cunniff returned to Room 56 at about 5:00 a.m. Stevens pointed out the gun under the bed, a Baretta 9 mm semiautomatic pistol, and Cunniff took possession of it. Beside the pistol under the bed was a knife in a leather holster. Stevens also showed Cunniff the two guns found in the suitcase in the kneehole of the dresser, a Smith & Wesson 9 mm semiautomatic pistol and a Walther 9 mm semiautomatic pistol, and the Smith & Wesson magnum revolver found between the mattress and

the box spring of the bed. All of the weapons were loaded. In addition to the weapons and items seen in plain view, Cunniff took custody of a suitcase having a luggage tag in the name "J. Gillen" and a holster with ammunition found in a fourth open suitcase.

From the parking lot of the Trade Winds Motel, officers seized the 1983 blue Dodge Aries, the blue Renault, and the blue Chevrolet pickup, and impounded the vehicles. They were later searched at the MSP barracks in Thomaston after search warrants had been obtained.

E. The Entry into Room 106 at the Navigator Motel and the Arrests of Defendants Cresta and Ford

At about 3:45 a.m. on December 11, while law enforcement agents were making arrests at the Trade Winds Motel, MSP Agent Kenneth MacMaster, along with MSP Sergeant Harry Bailey, MSP Trooper Robert Tupper and Maine Marine Patrol Lieutenant Perley Sprague, arrived at the Navigator Motel on radio instructions from Cunniff. MacMaster, Tupper and Sprague approached Room 106 located on the ground floor of the motel to the right of the lobby. No lights were seen coming from the room.

Armed and with his revolver drawn, MacMaster knocked on the door of Room 106. After a few seconds, a male voice responded, "Who's there?" MacMaster replied, "Police," and after another delay the voice repeated, "Who's there?" Again, MacMaster said, "Police," and added, "Open the door, we want to talk to you." MacMaster heard sounds within the room, and Sprague, who was positioned to the left of the door in uniform with his weapon drawn, observed that the inside curtain on the window facing the hallway had been moved aside. About 10 seconds later, the door opened about 1–1½ inches; the lights remained out. Shining a flashlight into the room, MacMaster observed defendant Cresta in his underwear standing six feet behind the door. When asked if he was

alone, Cresta turned and looked behind him. Sprague then kicked the door open, exposing to view a partially dressed man, defendant Ford, standing between the two beds. All three officers entered the room.

Joined a short time later by MSP Trooper Douglas Holmes, Parsons and Vittum, the officers patted down the defendants and made a cursory inspection of the room. Vittum recognized the occupants as two of the men he had seen earlier in the lounge of the Navigator Motel and advised the other officers to place them under arrest. Tupper arrested Cresta, patted down the clothing near him and found a buckknife. After looking in the bathroom for other occupants of the room, MacMaster placed Ford under arrest.

Within five minutes of entering the room, Sprague observed a pearl-handled Derringer pistol lying under the bed a few feet from where Cresta originally had been standing. Sprague then picked up a black gym bag located near Ford between the two beds. From the feel of the bag as well as the sound made by its contents as he dropped it onto the bed, Sprague suspected it contained other weapons.

A few moments later, as Ford was being handcuffed and led from the room and Cresta was dressing, Sprague told Holmes of the weapons he had found. Holmes took possession of the Derringer found under the bed and observed that it was loaded with two cartridges, one with a firing pin mark, indicating that it had misfired. He then opened the gym bag and found a Strum Rugger .22 caliber silencer, a Remington model 31 sawed-off shotgun and several rounds of hollow-point shells and shotgun shells. Two knives, one lying on top of the bed and the other on a night table, were also in plain view. The officers also found in open view a Realistic police radio scanner and a Betty Bear call frequency directory, and a police call directory behind the headboard of a bed. Lying exposed on top of the dresser, a receipt from the Navigator Motel listed the room as registered under the name "Parker." Alongside, the officers found the keys to a 1983 Oldsmobile Cutlass. All this evidence was seized.

The officers seized the Oldsmobile Cutlass from the parking lot and impounded it. The car was later searched pursuant to warrant at the MSP barracks in Thomaston.

## F. The Warrant Searches

On December 16, agents obtained from the United States Magistrate warrants to search the 1983 blue Dodge Aries, the blue Renault, the blue Chevrolet pickup truck, the Oldsmobile Cutlass, and a dark blue American Camper bag and large duffel bag taken from Room 106 of the Navigator Motel. The warrant for the Renault was returned without service on December 20, and a second warrant was obtained on December 20 which was identical to the first except that it sought authorization to seize fingerprints. All the warrants were executed on December 20, except that the second warrant for the Renault was executed on December 22.

## II.

### *The Law*

Defendants seek to suppress all the evidence obtained directly or indirectly from the foregoing searches and seizures, on the ground that the evidence was obtained in violation of their Fourth Amendment rights. In addition, defendants seek to suppress the tapes of Kenney's recorded telephone conversations, on the ground that Kenney had not voluntarily consented to the recording of his conversations by law enforcement officials and that, therefore, the recordings violated the federal wiretap statute. 18 U.S.C. § 2510 *et seq.*

For the reasons to be stated, the Court has concluded that defendants' motions to suppress must be in all respects denied.

## A. The Kenney Tapes

There is no merit whatsoever in defendants' challenge to the admissibility in evidence of the tapes of Kenney's recorded telephone conversations. In the

first place, only an "aggrieved person," defined by statute as a party to an intercepted wire communication, 18 U.S.C. § 2510(11), has standing to challenge the admissibility of the intercepted conversation. 18 U.S.C. § 2518(10)(a); *see Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). The only defendant with standing to seek suppression of any of Kenney's intercepted telephone conversations is Porter, who the government concedes was a party to the sixth call made by Kenney to someone at the Navigator Motel identifying himself as "Parker." The first five recorded calls were placed to Trundy, and he has not objected to their use at trial. Kenney placed the seventh and last call to Room 106 at the Navigator Motel. An unidentified male voice answered. No defendant has asserted that he was the person who answered that call. Thus, no defendant can challenge the admissibility of the seventh telephone conversation under the federal wiretap statute. *Id.; United States v. Cruz,* 594 F.2d 268, 273 (1st Cir.1979), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979).

 In the second place, the federal wiretap statute contains a specific exception to the general prohibition against electronic interception where a party to a communication has given "prior consent" to such interception. 18 U.S.C. § 2511(2)(c); *see United States v. Miller,* 720 F.2d 227, 228 (1st Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. Sanford,* 673 F.2d 1070, 1072 (9th Cir.1972). The record at the suppression hearing made perfectly clear that all seven conversations were recorded with Kenney's knowing and voluntary consent. Cunniff testified that at the December 9 meeting in the United States Attorney's office in Bangor, Kenney, who was represented by counsel, gave the agents blanket permission to record any call he placed. Bridges, who was present during the recording of all seven conversations, confirmed that before each call was recorded, the agents made sure Kenney understood and was comfortable with the procedure

and that each time he reiterated his consent, knowing full well that the call was being recorded. In addition, Kenney himself testified that he agreed to place the call and gave the officers permission to record them. Finally, although the issue of voluntariness was exhaustively explored at the suppression hearing, nothing in the record remotely suggests that Kenney's consent was coerced or otherwise involuntary, or that he was under the influence of drugs or alcohol.

No defendant's rights were violated by the interception and recording of Kenney's telephone conversations.

**B. The Warrantless Searches, Seizures and Arrests at the Trade Winds and Navigator Motels**

Defendants allege that the officers' warrantless entries into and searches of Room 56 of the Trade Winds Motel and Room 106 of the Navigator Motel, and the arrests of the defendants found therein violated their Fourth Amendment rights because they were not supported by probable cause or justified by exigent circumstances and did not fall within any other recognized exception to the Fourth Amendment warrant requirement. The Court disagrees.

 At the outset, the Court will once again set forth the basic principles of the law of search and seizure that are applicable to defendants' Fourth Amendment challenges to the motel room searches in this case. First, warrantless searches and seizures are constitutionally impermissible unless supported by probable cause and justified by either exigent circumstances or another recognized exception to the Fourth Amendment warrant requirement. *E.g., Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970). The burden rests on the government to prove that such circumstances existed or such exceptions were applicable when it attempts to validate a warrantless search or seizure. Second, in order to con-

test a search or seizure on Fourth Amendment grounds, a defendant has the burden of establishing a legitimate and reasonable expectation of privacy in the premises searched or the property seized. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 130–31 n. 1, 139, 148–49, 99 S.Ct. 421, 423–24 n. 1, 428, 433, 58 L.Ed.2d 387 (1978); *see United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–2553, 65 L.Ed.2d 619 (1980). It is well established that Fourth Amendment rights may not be vicariously asserted. *Alderman v. United States*, 394 U.S. at 174, 89 S.Ct. at 967.

Applying the foregoing principles separately to each of the motel room searches in this case, the Court will first consider which, if any, of the defendants have standing to challenge the legality of the search. The Court will then address defendants' Fourth Amendment arguments.

▪ *Room 56 of the Trade Winds Motel.* No defendant, other than Porter, Gillen, McCauley and Welch, even arguably has standing to contest the officers' entry into and search of Room 56 of the Trade Winds Motel. No other defendant has met the burden of establishing a reasonable and legitimate expectation of privacy in the premises searched or the property seized. The government strenuously argues that Porter, Gillen, McCauley and Welch have also failed to demonstrate a legitimate expectation of privacy in the room or its contents, *see United States v. Irizarry*, 673 F.2d 554, 556 (1st Cir.1962) (mere presence in motel room insufficient to establish standing); *United States v. Agapito*, 620 F.2d 324, 334 (2d Cir.1980) (same). But, for present purposes, the Court will assume that each of the four defendants who were found in Room 56 have standing to raise a Fourth Amendment challenge. Even if a defendant has carried the burden of demonstrating a legitimate expectation of privacy

in that room or any of its contents,[1] both the initial entry and search and the subsequent arrests and seizures were constitutionally permissible under long-standing exceptions to the warrant requirement.

(a) The Entry and Search

▪ It cannot be doubted that the facts and circumstances of which the officers were aware, recited above, provided ample probable cause to justify the entry into and search of Room 56, and the arrests of the four defendants found therein. Probable cause exists when the facts and circumstances within the officers' knowledge and derived from reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that a felony has been or is being committed. *United States v. Watson*, 423 U.S. 411, 414–24, 96 S.Ct. 820, 823–28, 46 L.Ed.2d 598 (1976); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959).

The DEA investigation and Kenney's intercepted telephone conversations had provided information that 50,000 pounds of marijuana was headed for the coast of Maine to be offloaded at Rockland. This information had been confirmed by the Coast Guard's seizure of the vessel "Adina," with 1,000 bales of marijuana secreted in its hold under a load of cement. Cunniff was aware that a prime suspect in the offloading operation was a large 6′5″ man named "Manny", Porter's nickname. Kenney's recorded telephone conversations confirmed Porter's role. Moreover, investigating officers had seen Kenney and Porter together at the Navigator lounge. At 10:40 p.m., December 10, during his surveillance of the Rockland area, Cunniff located an individual fitting Porter's description driving the blue 1983 Dodge Aries. At 3:30 a.m., December 11, while tracking the blue

1. Although Room 56 had not been registered under the name of any defendant, but in the name Johnston, a suitcase identified as belonging to "J. Gillen" was found in the room at the time of the search, suggesting that Gillen, at least, may have been a lawful occupant rather than a casual visitor.

Chevrolet pickup from the suspected offloading site, Cunniff again observed the blue Dodge Aries and the pickup parked in the parking lot of the Trade Winds Motel. Finally, as Cunniff was placing Trundy under arrest in the parking lot, he looked up to make eye contact with a 6'5" man watching from the balcony in front of Rooms 56 and 57 of the motel. Trundy, a party to five of Kenney's telephone conversations, had just come from that area. As Cunniff approached to investigate, the 6"5" man disappeared into one of the rooms, and the lights were extinguished. Clearly, these facts and circumstances were more than sufficient to warrant the officers in believing that illicit smuggling of contraband was in progress and to justify the initial entry into Room 56. *See United States v. Watson*, 423 U.S. at 423–24, 96 S.Ct. at 827–28.

 The Court rejects defendants' contention that there were no exigent circumstances to justify the warrantless raid. In this Circuit, the ultimate test for determining whether exigent circumstances exist justifying a warrantless entry "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Adams*, 621 F.2d 41, 44 (1st Cir. 1980); *see also Archibald v. Mosel*, 677 F.2d 5 (1st Cir.1982). It is evident that a compelling necessity for immediate action existed in this case. Cunniff entered the room by force when, after he had identified himself as a police officer, Porter attempted to slam the door in his face. Cunniff had no knowledge of how many individuals might be within the room or whether they were armed. Aware of the frequent involvement of weapons in marijuana smuggling ventures along the Maine coast, he was justifiably concerned for his own safety. *See Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *United States v. Irizarry*, 673 F.2d at 558. Additionally, Cunniff reasonably could have concluded that immediate action was necessary because individuals in

the room might warn other conspirators to flee or destroy evidence. *See United States v. Edwards*, 602 F.2d 458, 468 (1st Cir.1979). Under these circumstances, where "criminal activity was underway and a substantial danger existed that evidence would be removed or culprits would escape unless prompt action was taken," *United States v. Balsamo*, 468 F.Supp. 1363, 1380 (D.Me.1979), the officers, having probable cause, had ample grounds to enter Room 56 without a warrant. *See United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976); *Warden v. Hayden*, 387 U.S. at 298–99, 87 S.Ct. at 1645–46.

The Court also rejects defendants' contention that probable cause had existed for a sufficient time to enable the agents to obtain a magistrate's approval before entering Room 56. The argument, principally advanced by Porter, is that the officers had acquired sufficient information to arrest Porter by 10:40 p.m., December 10, and should have secured a warrant for his arrest at that time. This argument misses the mark. The crucial ques.ion before the Court is not whether the agents may have had probable cause to arrest Porter at 10:40 p.m., December 10, but whether exigent circumstances permitted them to make a warrantless entry into Room 56 at 3:30 a.m., December 11. The record of the suppression hearing reveals that the officers only learned that suspected conspirators might be at the Trade Winds Motel when they located the blue Dodge Aries, together with the blue Chevrolet pickup which had been observed traveling back and forth to the offloading site, in the parking lot of the motel. The evidence also discloses that Room 56 became a target of the investigation only after Trundy was seen emerging from that location and Cunniff observed a man of Porter's description standing on the balcony in front of the open door to Room 56. Only when the officers observed the vehicles, Trundy and Porter at the Trade Winds Motel did they

have probable cause for their entry into Room 56.[2]

No defendant's Fourth Amendment rights were violated by the initial entry and search of Room 56 of the Trade Winds Motel.

### (b) The Arrests and Seizures

 Once lawfully inside Room 56, the officers had probable cause to arrest, without a warrant, the four defendants found there. It is undisputed that the agents had probable cause to arrest Porter.[3] From Kenney they had learned that five or six "lumpers" would assist in the offloading operation. They had previously observed Gillen seated in the Wayfarer Lounge near Kenney, Porter and Cresta. Although the agents did not know the exact identities of Gillen, McCauley and Welch, their presence in the motel room along with Porter, two Motorola radios and substances resembling marijuana and cocaine in open view would reasonably lead a prudent person to infer that these, as yet unidentified individuals, were involved in criminal activity. *See United States v. Watson,* 423 U.S. at 414–424, 96 S.Ct. at 823–828; *Brinegar v. United States,* 338 U.S. at 175–76, 69 S.Ct. at 1310–11; *Henry v. United States,* 361 U.S. at 102, 80 S.Ct. at 171. *Cf. Beck v. Ohio,* 379 U.S. 89 at 91, 85 S.Ct. 223 at 225, 13 L.Ed.2d 142.

 The government has stipulated that it will not offer in evidence the Smith & Wesson .357 magnum revolver found between the mattress and box spring of the bed in Room 56 upon which McCauley and Welch had been sitting, after all defendants had been removed from the room.[4] The other evidence seized from Room 56 that the government proposes to introduce at trial was properly seized since such items were either in plain view, *see Coolidge v. New Hampshire,* 403 U.S. at 464–66, 91 S.Ct. at 2037–38, or discovered in the course of a protective weapons search incident to lawful arrests, *see Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

Upon entering the room, the agents immediately observed two portable Motorola two-way radios lying on a table. Similarly, the vial and white powder found on the bathroom floor, the plastic bag containing a green leafy material, and the motel registration were visible from areas in which the officers were lawfully present. The agents were entitled to seize this evidence, found in plain view, without a warrant. *Coolidge v. New Hampshire,* 403 U.S. at 464–66, 91 S.Ct. at 2037–38.

 The "plain view" doctrine also justified the seizure of the handgun (the Baretta 9 mm semiautomatic pistol) which Stevens had observed protruding from underneath the bed closer to the door. *Id.* Moreover, once defendants had been lawfully arrested, Stevens was entitled to

---

2. Defendants strenuously argue that the presence at the Trade Winds Motel of a reporter and cameraman from television station WBZ in Boston indicates that the agents must have had advance knowledge that the conspirators would be at the motel. As the testimony of the WBZ reporter at the suppression hearing made clear, however, no government agent directly or indirectly pointed him to Rockland or to the Trade Winds Motel. It cannot seriously be argued that the fortuitous presence of the WBZ television crew at the Trade Winds Motel undercuts the exigency that justified the officers' warrantless entry into Room 56.

3. Counsel for Porter, the only defendant with standing to challenge his arrest, does not deny that the officers had probable cause to arrest him by 10:40 p.m. the previous evening. He argues that Porter's rights were violated because the officers improperly delayed his arrest until 3:30 a.m. the next morning. This argument borders on the frivolous. It is well established that law enforcement officials have no obligation to execute an arrest immediately upon establishing probable cause. *United States v. Watson,* 423 U.S. at 431, 96 S.Ct. at 831 (Powell, J., concurring). Indeed, good police practice often requires continuing surveillance or investigation in order to obtain additional evidence or to identify other offenders. *Id.; see also United States v. Lovasco,* 431 U.S. 783, 792–93, 97 S.Ct. 2044, 2050, 52 L.Ed.2d 752 (1977). Here, the continued surveillance of Porter and the suspected offloading crew produced just such a result.

4. At oral argument, the government also stated that it would not offer in evidence cocaine found in Gillen's suitcase.

search areas within their immediate control to insure the officers' safety and to prevent the destruction of evidence. *Chimel v. California,* 395 U.S. at 763, 89 S.Ct. at 2040; *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). Since the pistol under the bed was within the reach of McCauley and Welch at the time it was discovered, Stevens could lawfully seize the weapon. *Id.*

■ Finally, having discovered one weapon visible under the bed, Stevens was justified in continuing a protective weapons search by patting down items on top of and under the dresser as well as those in the open suitcase in the kneehole of the dresser. Detecting the presence of two other weapons in the suitcase, (the Smith & Wesson 9 mm semiautomatic pistol and the Walther 9 mm semiautomatic pistol), he placed himself between the defendants and the weapons, but did not remove the guns. By placing the weapons within his exclusive control and preventing defendants' access to them, Stevens had effectively seized the guns at that moment. His warrantless seizure of these weapons in the course of a protective weapons search incident to lawful arrests did not violate the Fourth Amendment. *Chimel v. California,* 395 U.S. at 763, 89 S.Ct. at 2040; *see United States v. Jacobsen,* —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *State v. Ortiz,* 683 P.2d 822 (Hawaii Sup.Ct.1984).

No defendant's Fourth Amendment rights were violated by the arrests and seizures in Room 56 of the Trade Winds Motel.

■ *Room 106 of the Navigator Motel.* Only Cresta and Ford have standing to contest the officers' entry into and search of Room 106 of the Navigator Motel. No other defendant was present in the room or has asserted any proprietary or possessive interest in the room or its contents. The government argues that Cresta and Ford also have failed to establish that they had a legitimate expectation of privacy in Room 106 or its contents because the room had not been registered under either name, but in the name Parker. At the time the officers entered, however, both men were partially undressed and standing before unmade beds. In these circumstances, it is reasonable to conclude that they lawfully occupied the room as motel guests entitled to constitutional protection against unreasonable searches and seizures. *See Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *United States v. Lyons,* 706 F.2d 321, 325–29 (D.C. Cir.1983).

In any event, there is no merit to any of defendants' attacks on the events at Room 106. Both the initial entry and search, and the subsequent arrests and seizures, were permissible under recognized exceptions to the warrant requirement.

(a) The Entry and Search

■ At the time Cunniff directed the agents to Room 106 of the Navigator Motel, there is no question that he had substantial reason to believe the room might contain evidence of criminal activity. Since the interception of the Adina, he had no doubt that a smuggling conspiracy was underway. From information provided by Kenney, he knew that an offloading crew consisting of Trundy, Porter, and five or six "lumpers" had been assembled in Rockland and that some of them were staying at Room 106 under the name "Parker." Earlier that evening, "Parker" had responded to Kenney's sixth call to Room 106, and in Kenney's final call to that room an unidentified male voice had informed him that "we" would be waiting for Trundy in the room. Such facts provided ample basis to investigate who was in Room 106.

The Court rejects defendants' contention that there were no exigent circumstances justifying the warrantless entry into Room 106. It is plain that a compelling necessity for immediate action existed in this case. At the time Cunniff instructed other agents to investigate Room 106, he had just arrested six defendants at the Trade Winds Motel. He did not know how many other conspirators might be at the Navigator Motel, or whether they had already learned of

the arrests and were attempting to flee or to destroy evidence. When the officers arrived at Room 106, the reaction of the defendants in response to MacMaster's knock on the door made clear the need to enter the room and take immediate action. After MacMaster had identified himself as "Police," the defendants delayed before opening the door. The officers heard noises from within the room, and Sprague observed that the curtain had been moved aside. When the door finally opened, the room remained dark. Asked if anyone else was in the room, Cresta did not respond, but looked behind him, suggesting that others were present. Justifiably concerned for their own safety, *see United States v. Irizarry*, 673 F.2d at 558, the officers were not required to "gravely endanger their lives" by delaying their entry into the room in order to secure a warrant. *See Warden v. Hayden*, 387 U.S. at 298–99, 87 S.Ct. at 1645–46.

■ Defendants contend that the officers had acquired sufficient information in the early evening of December 10 to have obtained a search warrant at that time. Again, however, law enforcement officers are not constitutionally required to obtain a warrant as soon as they believe they may have probable cause to make an arrest. *United States v. Watson*, 423 U.S. at 431, 96 S.Ct. at 831 (Powell, J., concurring). Law enforcement officers reasonably may continue surveillance in the hope of obtaining additional evidence and identifying other suspects. *Id.; see also United States v. Lovasco*, 431 U.S. at 792–93, 97 S.Ct. at 2050.

(b) The Arrests and Seizures

■ Once lawfully inside Room 106, the officers had probable cause to arrest, without a warrant, the two defendants found there. Cresta had accompanied Porter and Kenney on an inspection tour of the off-loading site the previous evening. Kenney reported that Cresta had done most of the talking and had expressed dissatisfaction

with the location. Ford's presence in the motel room along with Cresta gave the officers reasonable grounds to conclude that he, too, was a conspirator. Moreover, Vittum recognized both defendants as two of the men he had seen earlier in the lounge of the Navigator Motel.

■ The evidence seized from Room 106 was properly seized since it was either in plain view, *see Coolidge v. New Hampshire*, 403 U.S. at 464–66, 91 S.Ct. at 2037–38, or discovered in the course of a protective weapons search incident to lawful arrests, *see Chimel v. California*, 395 U.S. at 763, 89 S.Ct. at 2040.

The *Coolidge* "plain view" doctrine justified the seizure of the Derringer pistol which Sprague observed lying under the bed. Additionally, since the weapon was only a few feet from Cresta, Holmes could lawfully seize the weapon under the *Chimel* doctrine. Having discovered one handgun, the officers were justified in conducting a protective weapon search of other areas in the room within the defendants' immediate control. *Id.* It was during this security check, made while Cresta was dressing, that Tupper found a buckknife in Cresta's clothing and Sprague found the gym bag between the two beds which he suspected contained other weapons. Since Sprague had effectively secured the weapons for the protection of himself and the other officers, no warrant was required when Holmes opened the bag and ascertained its contents while defendants were still in the room. *Id.; see United States v. Jacobsen*, — U.S. —, 104 S.Ct. 1652, 80 L.Ed.2d 85; *State v. Ortiz.*

The "plain view" doctrine justified the seizure of the remaining evidence from Room 106 that the government proposes to introduce at trial: the two buckknives, the police radio scanner, the hotel receipt, the radio frequency directory, and the keys to the 1983 Oldsmobile Cutlass.[5]

No defendant's Fourth Amendment rights were violated by the arrests and

---

5. The government has stipulated that it will not offer in evidence the second police radio fre-

quency directory found behind the headboard of the first bed.

seizures in Room 106 of the Navigator Motel.

## C. The Warrant Searches

■ Defendants seek to suppress all the evidence seized on December 20 and 22 pursuant to the search warrants issued by the United States Magistrate for the Dodge Aries and the Renault, impounded at the Trade Winds Motel; the Oldsmobile Cutlass, impounded at the Navigator Motel; and the American Camper bag and large duffel bag seized from Room 106 of the Navigator Motel.[6] They contend that their Fourth Amendment rights were violated: (1) because the officers lacked probable cause for the warrantless seizures of the three vehicles; and (2) because the supporting affidavits did not establish sufficient probable cause for the issuance of the warrants.[7] Neither of defendants' contentions has merit.

■ *The Defendants' Standing.* In order to contest the unlawful seizure or search of a vehicle or other personal property on Fourth Amendment grounds, a defendant has the burden of establishing that he had a reasonable and legitimate expectation of privacy in the vehicle or property seized. *Rawlings v. Kentucky,* 448 U.S. at 104–06, 100 S.Ct. at 2561–62; *Rakas v. Illinois,* 439 U.S. at 130–31 n. 1, 139, 148–49, 99 S.Ct. at 423–24 n. 1, 428, 433; *see United States v. Salvucci,* 448 U.S. at 91–92, 100 S.Ct. at 2552–2553. No defendant, other than Welch and Rogers, have asserted any proprietary of possessory interest in

any of the three vehicles, the camper bag or the duffel bag. Apart from Welch and Rogers, therefore, no defendant has standing to contest these challenged seizures and searches.[8]

■ The evidence at the suppression hearing established that Welch had leased the Dodge Aries from a car rental agency, and that Rogers had similarly leased the Renault. Although the government argues that Welch and Rogers have not established a legitimate privacy interest in these cars, for purposes of this opinion, the Court will assume that Welch has standing to contest the seizure and search of the Dodge Aries, and that Rogers may challenge the seizure and search of the Renault. As lessees of the vehicles, these defendants had a possessory interest which, although they may have previously permitted others to drive them, entitled them to a reasonable expectation of privacy at the time the vehicles were seized, parked and empty, in the parking lot of the Trade Winds Motel. *See United States v. Mulligan,* 488 F.2d 732, 736–37 (9th Cir.1973), *cert. denied,* 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974).

■ *The Seizure of the Vehicles.* The warrantless seizure and impoundment of the Dodge Aries and the Renault from the parking lot of the Trade Winds Motel and the Oldsmobile Cutlass from the parking lot of the Navigator Motel were authorized by 21 U.S.C. § 881(a)(4), (b)(4). The officers had more than adequate grounds to believe that these vehicles were being used in furtherance of the marijuana smuggling

---

**6.** Defendant Hardy, Sr., the only defendant who conceivably could challenge the seizure and search of the blue Chevrolet pickup truck, is not seeking suppression of any evidence found in the warrant search of that vehicle.

**7.** Defendant Sheree Rogers also argues that because the return on the warrant for the search of the Renault, a rental car leased to her, did not list a set of scales apparently found in the vehicle, all evidence seized from the vehicle must be suppressed. This argument is hardly worthy of consideration. Although Fed.R. Crim.P. 41(b) requires that a return on a search warrant "shall be accompanied by a written inventory of any property taken," it is well settled that, absent prejudice, an incomplete return

does not require the suppression of evidence. *E.g., United States v. Dauphinee,* 538 F.2d 1, 3 (1st Cir.1976). Rogers has not shown that she was in any way prejudiced by the omission from the warrant return. *See United States v. Hall,* 505 F.2d 961, 964 (3d Cir.1974).

**8.** Although at the suppression hearing Ford's counsel was repeatedly invited by the Court to offer evidence supporting Ford's claim of a proprietary or possessory interest in the Oldsmobile Cutlass, he persistently refused to do so. Accordingly, Ford has failed to carry his burden of establishing standing to contest the seizure and search of that vehicle. *See Rakas v. Illinois,* 439 U.S. at 130–31 n. 1, 99 S.Ct. at 423–24 n. 1.

venture. The agents had observed Porter driving the Dodge Aries on December 10. On the same day, they had seen Impemba and Agudelo in the Renault at the Burger King restaurant in Rockland. Both vehicles were found with the Chevrolet pickup parked in the parking lot of the Trade Winds Motel, where six defendants were arrested. Similarly, the keys to the Oldsmobile Cutlass had been found in Room 106 of the Navigator Motel, where two other defendants had been arrested. Having probable cause to believe that these vehicles had been used or were intended for use in transporting or facilitating the transportation of controlled substances, the officers could lawfully seize and impound the vehicles without a warrant. 21 U.S.C. § 881(a)(4), (b)(4); *see United States v. Capra*, 501 F.2d 267, 280 (2d Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *see also United States v. One 1972 Chevrolet Nova*, 560 F.2d 464, 469–70 (1st Cir.1977); *United States v. Balsamo*, 468 F.Supp. at 1381. *Cf. United States v. Pappas*, 613 F.2d 324, 326–30 (1st Cir.1979).

 *Sufficiency of the Affidavits.* When a search is based upon a warrant, the supporting affidavits presented to the magistrate "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965). Unlike warrantless searches and seizures, those conducted on the authority of a warrant enjoy a presumption of validity. *United States v. Ventresca*, 380 U.S. at 106, 85 S.Ct. at 744.

 There can be no doubt that the six search warrants were supported by an ample showing of probable cause. The warrants were all supported by two affidavits executed by Cunniff. The affidavits related in detail the facts, recited above, that were known to the officers as a result of the Coast Guard's interception and boarding of the "Adina," Kenney's recorded telephone conversations, and the surveillance established at various locations in Rockland, leading to the arrests of nine suspects and the seizure of numerous weapons and four vehicles. The specific facts recited in the supporting affidavits clearly furnished a substantial basis for the magistrate to conclude that instrumentalities or evidence of a conspiracy to possess with an intent to distribute marijuana would likely be found in the four vehicles, the American Camper bag and the duffel bag which the warrants authorized to be searched. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (June 8, 1984); *Franks v. Delaware*, 438 U.S. at 165, 98 S.Ct. at 2681; *United States v. Ventresca*, 380 U.S. at 106, 85 S.Ct. at 744.

No defendant's Fourth Amendment rights were violated by the vehicle seizures and warrant searches in this case.

### III.

#### Order

Defendants' motions to suppress are in all respects DENIED.

IT IS SO ORDERED.